178 So.2d 810

Sanford L. **HUTTO**

v.

**STATE** of Alabama.

1 Div. 134.

Supreme Court of Alabama.

Aug. 12, 1965.

Thos. M. Haas, Mobile, for appellant.

Richmond M. Flowers, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

**418**

COLEMAN, Justice.

From conviction for murder in the second degree defendant appeals.

On Thursday evening, September 20, 1962, three young men met a woman at a restaurant in Saraland. Defendant joined the group and left the restaurant with them some time later. Defendant was driving his automobile. The woman and one of the three young men were in the back seat. Defendant drove to a wooded area in or near Saraland and stopped. Later, the other two of the three young men followed in another car and came to the place where defendant's car had stopped. One or more of the three young men had sexual intercourse with the woman. The three young men drove off and left defendant and the woman together.

In the late afternoon of Friday, September 21, 1962, two boys found the body of the woman and police were notified. The toxicologist testified that a knotted handkerchief was tied tightly around the woman's neck, and that analysis of a sample of blood taken from the woman's body showed "that there was a percentage of alcohol in the blood sufficient to render the person from whom the blood was taken intoxicated."

The assistant coroner testified that he performed an autopsy on the body and that death was due to strangulation brought about by the handkerchief knotted about the neck. Defendant was convicted of murdering this woman.

Counsel for defendant argues the points which call for consideration.

Defendant argues that he should have been granted a continuance on account of an occurrence, which took place while the court was qualifying the venire, as follows:

"THE COURT: Gentlemen, do any of you know any members of the defendant's family?

"MR. TRAVIS WALKER: I think his sister works in the store up there where I am at.

"THE COURT: All right. Are there any other questions you wish me to put to this gentleman. Mr. Newbill is standing there. Yes, sir.

"MR. NEWBILL: I knew the deceased's family.

"THE COURT: Might I ask the extent of the knowledge? What was the acquaintance?

"MR. NEWBILL: I lived in the area in which she lived and I knew her ex-husband real well. And I knew her children while she was in the insane asylum—

"THE COURT: Well, all I want, Mr. Newbill, is your knowledge of the family, not any of the other.

"MR. HAAS: If the Court please, in view of the unfortunate statement from the juror, the defendant humbly asks for another panel of jurors to hear this case.

"THE COURT: Motion is denied.

"MR. HAAS: Exception."

■ Under the rule expressed in Fisher v. State, 23 Ala.App. 544, 129 So. 303, it

is error to permit the state to show, over defendant's objection, the number of children left by deceased, their ages, etc. Certainly, under that rule, the court would have erred to reversal if the court had permitted the state to show, over defendant's objection, that deceased left children. See Knight v. State, 273 Ala. 480, 142 So.2d 899. Such evidence has no probative value with respect to the issues before the jury and is prejudicial to defendant because the evidence tends to provoke, in the jury, sympathy for the children of deceased who have lost a parent and animosity against defendant who has allegedly caused the loss. Evidence that deceased had been in the insane asylum is likewise irrelevant and could tend to prejudice defendant.

■ The statement, however, was made by a juror and not by a witness. If the statement had been volunteered by a witness, defendant could and should have moved the court to instruct the jury to disregard the statement. We think, if defendant thought the statement damaging, he should have so moved the court with respect to the statement here. In view of the nature of the statement, i. e., merely that the speaker knew the children of deceased while she was in the insane asylum, we are of opinion that any prejudicial effect could have been removed by instructions from the court to the jury to disregard the statement. We are not to be understood as holding that the prejudice of a statement going into greater detail could be removed by such an instruction to the jury.

Further, this statement did not come from the witness stand, and the court, in its oral charge, said to the jury:

"Now, gentlemen, you are the sole judges of the facts in the case and you take the law as the Court has given it to you and the evidence as it has come to you from the witness stand and you put the two together and say whether or not this defendant is guilty or not guilty. Do not dwell upon surmise, conjecture or guesswork, or undertake to reconstruct in your own mind what the facts might have been, but take the facts as they come to you from the sworn testimony given in this Court. . . . . .."

We hold that denial of continuance was not error.

Defendant argues that the court erred in admitting into evidence state's exhibit 1 over defendant's objection. Exhibit 1 is a photograph of the face, neck, hands, left shoulder, and left arm of deceased. The body is clothed.

The toxicologist testified that the exhibit fairly and accurately shows the way the handkerchief was around the neck of the deceased at the time the witness first observed the body at the scene.

■ On examining the picture, we are of opinion that the picture meets the test that it must have some tendency to prove or disprove some disputed or material issue, to illustrate some other material fact or evidence, or to corroborate or disprove some other evidence offered or to be offered. It must have some tendency to shed some light on some material inquiry. Rollings v. State, 160 Ala. 82, 49 So. 329; Nichols v. State, 267 Ala. 217, 100 So.2d 750. Overruling objection to the photograph was not error.

Defendant argues that the court erred in overruling defendant's objections and admitting into evidence two written confessions allegedly made by defendant.

To follow a chronological order, however, we note first the testimony of a patrolman of the Saraland Police Department. The patrolman testified that about 5:00 p. m., on Friday, September 21st, he arrived at the place where the body had been found that day; that he kept vehicles from entering the road; that he remained there until 10:00 p. m.; that, while there, he saw a number of people; and that defendant came there about 5:35 p. m.

The patrolman testified that defendant was not threatened or offered any induce-

ment or hope of reward in order to get him to make a statement, and that no violence was applied to defendant. Over defendant's objection, the patrolman testified that defendant said: " 'I did it. Here I am. Lock me up or take me later.' "; that defendant remained where patrolman was for fifteen or twenty minutes; that the patrolman did not arrest defendant; and that the patrolman did not see defendant any more or thereafter participate in the investigation. Defendant does not argue that this oral confession was not voluntary or that evidence to prove it was not admissible.

On voir dire, when the jury was not present, the patrolman testified that he had been present "down in General Sessions Court when a hearing was held in this case" and did not testify and that he did not testify before the grand jury.

After the jury returned to the box, on cross-examination, defendant asked the patrolman whether he had testified before the grand jury or at the preliminary hearing. The state objected to each question and the court sustained the objections. Defendant argues that the court erred in so ruling.

Defendant says the rulings were erroneous because the cross-examination was unduly limited and the jury was entitled to know all the circumstances surrounding the alleged confession.

Whether the patrolman did or did not testify at the preliminary hearing or before the grand jury sheds no light on the issue of defendant's guilt or on the credibility of the patrolman. The question whether he had testified earlier is not the same question as when did he first make known to his superiors the fact that defendant had made the alleged oral confession. It may be that the failure of the witness to come forward with his testimony at the earliest reasonable opportunity would reflect on his credibility. The defendant cross-examined the patrolman as to when he reported the confession to his superiors and the jury had the full benefit of the questions and of the patrolman's answers.

On the other hand, the failure of the patrolman to testify before the grand jury or on preliminary hearing may well have been because the solicitor decided that the patrolman's testimony was unnecessary on those occasions.

■ We are of opinion that the court did not err in sustaining the objections to the questions asking the patrolman whether he had testified earlier.

Two written confessions allegedly made and signed by defendant were admitted into evidence over defendant's objection, and defendant strenuously insists that the court erred in overruling his objections. In brief, defendant states the circumstances of the confession as follows:

"On the afternoon of September 22, 1962, two or three police officers went to the home of the Appellant in Saraland, Alabama, and took the Appellant to the police station at Saraland. The Appellant was questioned by the Sheriff of Mobile County, Alabama, and one of his deputys, the Chief of Police of the town of Saraland, and perhaps other officers, from about 2:00 P.M., September 22, 1962, until around midnight of the same day. The Appellant made no statement on that day. Around midnight, the Chief of Police of the town of Saraland placed a charge on the docket book of said town against the Appellant, apparently being a charge of vagrancy under some ordinance of the town of Saraland. The Appellant was kept in the town jail and was again questioned from about forty-five minutes to an hour and a half, on Sunday, September 23, 1962. Again, the Appellant made no statement.

"The Appellant's step-brother, Frank Pridgen, Jr., was an Officer for the town of Saraland. On the morning of September 24, 1962, at approximately 6:00 A.M., Officer Pridgen went to the jail cell in which the Appellant was confined, and had a conversation with

the Appellant. The Appellant asked the Officer when they were going to let him out of jail, and the Officer told him that if he tried to get out of jail, he was going to be charged with murder. At this time the Officer asked the Appellant whether or not he had killed the woman, Dolly Wyrosdic, and the Appellant said that he did not. The Appellant further stated at that time that he was willing to take a lie detector test.

"Later in the day of September 24, 1962, and after having been in custody continuously since approximately 2:00 P.M. of September 22, 1962, the Appellant allegedly made a written confession, which appears on page 139 of the Record. At about 8:30 in the evening of September 24, 1962, the Appellant was taken to the Mobile County jail and there booked on the docket in said jail on a charge of murder in the first degree. On the morning of September 25, 1962, at the County jail, the Appellant allegedly made another signed statement, which appears on page 146 of the Record.

"It does not appear that the Appellant was ever taken before any Magistrate during his time of confinement at Saraland jail. The so-called vagrancy charge was Nolle Prossed on September 27, 1962, without the Appellant even being present.

"Defense testimony show (sic) that the Appellant, a man of twenty-two years of age at the time of trial, had been suffering from headaches and dizzy spells since he was about twelve or thirteen years of age. The testimony shows that he lived with his mother practically all of his life, except for a short visit with his father down in Florida when he was around twelve years of age. Evidence showed that the Appellant had a good general reputation and a good reputation for keeping the peace, and morals. The evidence taken as a whole indicates that the Appellant was a person of average, or below average intelligence, who worked from time to time as a laborer."

The state undertakes to correct defendant's statement of the facts relating to the confessions by noting that Chief Harbin, Deputy Tom Dees, and Sheriff Bridges "testified as to the arrest and questioning of appellant, and that his confession was voluntary"; that instead of volunteering to take a lie detector test, defendant replied affirmatively to a question whether he would take such a test; that defendant "voluntarily went to the Saraland jail for questioning"; that he was first booked on a vagrancy charge and later on a murder charge.

Defendant appears to argue that the written confessions are inadmissible because he was illegally kept under arrest in violation of § 160, Title 15, Code 1940; that is, because the arresting officers failed to carry defendant promptly or forthwith before a magistrate.

At the trial, the state's witnesses appeared to take the view that defendant was not under arrest prior to midnight on Saturday, and, in brief, the state says: "Evidence showed the appellant voluntarily went to the jail for interrogation."

Deputy Dees and two officers of the Saraland Police Department went to defendant's home and defendant went with the three officers to the police station. One of the police officers was a step-brother, and also brother-in-law, of defendant. This officer testified that he asked defendant to come down to the station on Saturday afternoon about 1:30 or 2:00 o'clock, and that defendant said he would.

It may be that defendant went to the station without being arrested. Sheriff Bridges testified that defendant "was officially put on the docket . . . . at 8:00 Monday night and charged with murder." This was after defendant had made the first written confession "sometime in the morning or early afternoon" on Monday.

The record contains the following questions and answers during cross-examination of Sheriff Bridges:

"Q Then, he wasn't even under arrest Saturday afternoon, Saturday night, Sunday or Monday?

"A He was booked for vagrancy. He was in custody of the Saraland P.D. for vagrancy during that time, sir.

"Q Yes, sir. But that was after midnight on Saturday, early Sunday morning that he was booked for vagrancy in Saraland.

"A Approximately 1:00 PM. (*sic*).

"Q And he had already been there at the jail for over ten hours at that time, hadn't he?

"A Somewhere between 2:00 and 3:00 PM the afternoon before, sir.

"Q Or approximately ten hours?

"A Yes, sir.

"Q But he wasn't under arrest, is that your testimony?

"A No, sir.

"Q Was he free to go?

"A Mr. Haas, I don't know how to answer that question. We were still questioning him.

"Q Well, let me ask you this, Sheriff, suppose along about 4:30 or 5:00 PM, Sam here got up and said, 'bye, Sheriff' and started out the door, what would you'all have done?

"A We would probably have went and got him, Mr. Haas.

"Q You would have stopped him, wouldn't you?

"A Yes, sir."

We think it is clear that defendant was under arrest not later than 5:00 o'clock Saturday afternoon. There is no evidence as to when, if ever, defendant was taken before a magistrate. It can scarcely be contended that § 160, Title.15, was obeyed.

The McNabb rule excluding any confession obtained while defendant was illegally detained does not apply in Alabama. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; Ingram v. State, 252 Ala. 497, 42 So.2d 36; Duncan v. State, 278 Ala. 145, 176 So.2d 840.

The rule which renders incompetent confessions obtained by protracted and repeated questioning of ignorant and unlearned persons does apply here. Ingram v. State, supra.

A confession made by a person in custody is not always the result of an overborne will. Yet, neither the mind nor the body of an accused may be twisted until he breaks. The Supreme Court of the United States and "the courts of all the States have agreed in holding permissible the receipt of confessions secured by the questioning of suspects in custody by crime-detection officials." The Fourteeth Amendment does not prohibit a State from such detention and examination of a suspect as, under all the circumstances, is found not to be coercive. Frankfurter, J., in Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct 1860, 6 L.Ed.2d 1037.

Under the Judges' Rules; Archbold, Pleading, Evidence and Practice, §§ 1118–1121; 1 Stone's Justices Manual (92d ed 1960) 353–356; Note 41, Culombe v. State of Connecticut, supra; Home Office Circular No. 31/1964, issued January, 1964; Rodgers v. State, 42 Ala.App. 660, 177 So.2d 460; in the English courts, if a confession were offered ". . . . in a case . . . . where several hours of questioning could be shown—the trial judge would almost certainly exclude it." Culombe v. State of Connecticut, supra.

Officers questioned defendant for several hours in the instant case, but that circumstance alone is not enough to render the written confessions incompetent.

". . . . No single litmus-paper test for constitutionally impermissible interrogation has been evolved: neither extensive cross-questioning—deprecated by the English judges; nor undue delay in arraignment—proscribed by McNabb; nor failure to caution a prisoner—enjoined by the Judges' Rules; nor refusal to permit communication with friends and legal counsel at stages in the proceeding when the prisoner is still only a suspect—prohibited by several state statutes. (Citations Omitted.)

" Each of these factors, in company with all of the surrounding circumstances—the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control—is relevant. The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. (Citation Omitted.) The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." Culombe v. State of Connecticut, supra, 367 U.S. 601, 602, 81 S.Ct. 1860, 1878, 1879.

For comprehensive list of cases, see Davis v. State, 42 Ala.App. 374, 379, 165 So. 2d 918, 923.

In addition to the instant circumstances already stated, the following should be noted.

Defendant conceded that the officers did not hit or strike defendant. We think the record shows that no physical violence or threat of it was employed against defendant.

The Saturday questioning lasted about ten hours from 2:00 p. m. or 3:00 p. m. to midnight. Chief Harbin testified that from time of apprehension until confession, defendant "was fed continuously during this period of time at any meal times"; that defendant "was fed several times"; that, on Saturday evening during the time the witness was talking to defendant, Sheriff Bridges offered to get defendant something to eat; that on Sunday, defendant was questioned for "approximately 45 minutes"; that defendant made the confession on Monday which occurred during a conversation with defendant lasting approximately one hour.

Chief Harbin further testified that on Saturday he did not advise defendant of his right to counsel; that no one was present to advise defendant; that defendant made no confession or statement on Saturday; that, on Monday, the officer Pridgen, defendant's brother-in-law, told the witness that Pridgen had talked to defendant; and that, shortly thereafter, defendant admitted his guilt and made the first written confession.

Chief Harbin testified that Deputy Dees advised defendant that he did not have to give a statement and if he made a statement it could be used in a court of law. The statement signed by defendant and admitted into evidence recites that defendant had been so advised. Chief Harbin also testified as follows:

" MR. HAAS: A Deputy Sheriff going around advising people of their legal rights, that is ridiculous. Now, did you tell this boy here or any of these other officers tell him that he had a right to consult an attorney during all of these times of questioning and incarcerating out there?

" A    Yes.

"Q  And noone else did in your presence, did they, sir?

"A  No, sir."

Chief Harbin further testified that defendant did not complain of having a headache or of being nervous or dizzy but defendant appeared to be nervous; that defendant remained at the Saraland jail until Monday evening between 7:00 and 8:00 p. m. when he was taken to the Mobile County Jail.

Chief Harbin testified that he again talked to defendant at the county jail, in presence of Deputy Dees and a secretary on Tuesday morning, September 25, and defendant signed the second written confession; that, to the knowledge of the witness, defendant had not been taken before a magistrate and that the witness did not know whether defendant had been given opportunity to consult an attorney.

Deputy Dees testified that during the Saturday interrogation, "there was breaks and intervals"; that sandwiches were ordered and eaten; that the witness offered to get defendant something to eat or drink; that defendant said he did not want a sandwich but did drink a Coca Cola which witness got for defendant; that the Sunday interrogation lasted "maybe an hour or an hour and a half"; that the first confession was made on Monday about 11:30 in the forenoon.

The ten-hour interrogation on Saturday is the only element which raises any real question, under prevailing standards, whether the first written confession was voluntary. On close examination, we note that defendant came to the jail in company with three officers, one of whom was his brother-in-law; that defendant was questioned at length, but the questioning was not continuous in that there were breaks or intervals, the length of which is not shown; that defendant was not deprived of food or sleep; that he apparently did not ask for a lawyer; that before defendant gave the first written confession he was advised that he did not have to give a statement; that he did not confess on Saturday; that he was questioned not more than an hour and a half on Sunday and did not confess; and that he did confess about noon on Monday during a period of interrogation lasting about an hour.

We are of opinion that, under all the circumstances, the trial court was justified in finding that defendant's will was not overborne and that the written confessions were voluntary.

Affirmed.

SIMPSON, J., concurs.

LAWSON and GOODWYN, JJ., concur specially in opinion which will be filed subsequently.

LAWSON and GOODWYN, Justices (concurring specially).

We have recently undertaken to express our views as to the holdings of the United States Supreme Court in Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933; Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205; and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d 977. See Duncan v. State, 278 Ala. 145, 176 So.2d 840.

We feel inclined to comment briefly as to the effect of those cases on the case at bar.

This record discloses neither a Fourth Amendment (Mapp v. State of Ohio, supra) problem nor any conceivable violation of the principles of voir dire examination laid down in Jackson v. Denno, supra, as we interpreted that opinion in Duncan v. State, supra.

However, we do feel that the state of this record requires some comment on the application of the Escobedo case.

The State introduced several inculpatory statements, as well as two formal confessions, made by the appellant.

While initial police procedures were still in progress at the scene of the crime, accused asked many questions relative to the crime. During this same conversation he made the statement, "I did it. Here I am. Lock me up or take me later." While in police custody he made a formal confession admitting his guilt. The record shows that before the statement was taken a deputy sheriff advised him "* * * of his rights and that he did not have to give a statement, that if he made a statement that it could be used in a court of law." For aught that appears, the appellant never asked for counsel. On the following day, September 25, 1962, the appellant gave another confession. This written confession recites in question and answer form that accused was advised of his rights and did not have to make a statement and that if he made a statement it could be used in a court of law. Other than this documentary recital there is no testimony as to warnings by the interrogating officials. For aught that appears appellant did not ask for counsel.

As to the two inculpatory statements, it is quite obvious from the record that the investigation was still a general inquiry into an unsolved crime and had not begun to focus on a particular suspect. The accusatory stage had not been reached and, therefore, Escobedo, supra, has no application in our opinion. Duncan v. State, supra.

As to the first confession, the record shows that appellant was warned and also that he did not request counsel. Under our interpretation of the Escobedo case in our Duncan case, supra, these facts distinguish the present case from the holding in Escobedo.

As to the second confession, it is our opinion that the warning given as to the first confession was sufficient to cover the second one.

Of course, in view of the recent federal court decisions and the willingness of those courts to override decisions of state trial and appellate courts, no state court can be certain that any trial has been conducted in such a manner as to meet with approval of the federal courts either on direct review or by the use of the federal writ of habeas corpus. However, it is our studied judgment that the appellant in this case was not denied any right guaranteed to him by the federal or state constitutions and that his trial was in all respects conducted in accordance with the laws of this state.