219 So.2d 396

Edward BRAGGS

v.

STATE of Alabama.

1 Div. 438.

Supreme Court of Alabama.

Feb. 13, 1969.

Vernon Z. Crawford, Mobile, for appellant.

MacDonald Gallion, Atty. Gen., and W. Mark Anderson, III, Special Asst. Atty. Gen., for the State.

COLEMAN, Justice.

Defendant appeals from conviction for murder in the first degree with sentence of life imprisonment.

The evidence tending to support the contention of the state shows that the deceased was living with her son in a house on Wilson Avenue in Prichard. Allenby Street intersects Wilson Avenue

immediately south of the place. On Sunday, July 17, 1966, the son was working at Providence Hospital as a pharmacist. He got off from work about 11:15 p. m. He and a nurse went to Johnny's Drive-In for a sandwich. They went back to get her car about 12:30. He followed her home and then went home between 1:00 and 1:30 a. m. Monday morning, July 18. He looked into his mother's room, checked to see that she was all right, and went to bed in another room.

About 3:35 a. m. he woke up and heard his mother groaning. She was complaining of a terrible headache and calling out for medicine. He found her sick and bleeding and called an ambulance. Things in the house were intact except that a $5.00 bill was missing from his pants which he had left at the foot of his bed and which he subsequently found on a loveseat in the dining room.

When he went in to his mother's room, she had blood all over her face and there was blood on the pillow. He went to the bathroom adjoining her room and snapped on the light. There was blood all down the side of the wall and all over the bathroom. He dampened some wash cloths and was wiping the blood off her face. He could not tell where the blood was coming from. She was completely incoherent and did not recognize him. He turned the light on and there was blood all over the bed. There was blood on the floor by the bed and a trail of blood from the bed to the bathroom. His uncle and aunt arrived. Both front and back doors were secure. The other door had an air conditioning unit in it.

The mother was taken to the hospital and examined by two doctors. She had a laceration the full thickness of the scalp a little over an inch long and about a half inch in width. She was operated on and died the following morning approximately twenty-six hours later. Cause of death was brain damage caused by the laceration. She had a skull fracture.

Police officer Blake arrived at the house about 5:00 a. m. July 18. He found a window "raised a little bit." There is testimony as to the height it was raised varying from two to six inches. He went back inside the house. There were dried leaves and debris on the bloody pillow and a couple of leaves on the floor by the bed.

There is testimony to effect that the window had been pried open. Indentations or tool marks were found on the window which matched a yellow handled screw driver which was obtained from the house where Elijah Bridges lived.

A pair of dungarees or blue overall pants allegedly worn by defendant on Sunday night, July 17, were found to have on them fibers similar in size, material, shape, and color to fibers on the spread and sheets on the bed. Paint samples taken from the sill of the open window were found to be "identical in composition to the paint samples" cut out of the trousers.

Defendant's evidence tended to show that, in the early morning of July 18, he was at his sister's house some distance from the house of deceased and had no connection with the death of deceased.

Defendant argues several points in brief which we will discuss.

### 1 and 2.

Defendant argues that the court erred in denying defendant's motion to quash the indictment on the ground that the indictment had been found by a grand jury from which women had been systematically excluded.

The indictment was returned September 28, 1966. Judgment of conviction was rendered February 3, 1967. In White v. Crook, 251 F.Supp. 401, 410, the court considered the exclusion of women from juries in Alabama and said:

"... In this connection, since the next regular session of the Alabama Legislature is not scheduled until January, 1967, the defendants should be al-

lowed until June 1, 1967, considered by this Court to be a reasonable period prior to the time the defendants should be required to include women as jurors."

Indictment, trial, and conviction of defendant occurred prior to the cut off date set by the federal court for inclusion of women on juries, and, for that reason, if for no other, defendant's contentions based on exclusion of women from juries are not sustained.

### 3.

■ Defendant argues that the court erred in admitting the evidence of police officer Blake to prove that defendant had made certain inculpatory statements.

Defendant says that the warning, or statement of his rights, given to defendant by the officers did not comply with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974, in that defendant was not told that he had the right to remain silent. This argument is answered by the testimony of Blake on voir dire as follows:

"Q But you left out one thing didn't you? Did you tell him that he did not have to say anything at all?

"A Yes sir. We told him that any statement that he made could be used in a Court of law against him and during the course of questioning that if he wanted a lawyer he could have a lawyer present at the time of the questioning.

"Q Now Lt. I've asked you three times is that all, is that all, is that all and you never did once say that I told this Defendant or it was spoken in front of me by one of your officers that you do not have to say anything. Now did you tell him that or didn't you?

"A It was said in my presence. I don't remember who it was that said it."

■ Defendant says further that evidence of the inculpatory statements was not admissible because defendant was not promptly taken before a magistrate as required by § 160, Title 15, Code 1940.

This court has said:

"The McNabb rule excluding any confession obtained while defendant was illegally detained does not apply in Alabama. (Citations Omitted)" Hutto v. State, 278 Ala. 416, 422, 178 So.2d 810, 815.

In Fikes v. Alabama, 352 U.S. 191, 194, 77 S.Ct. 281, 1 L.Ed.2d 246, in considering admissibility of a confession, the court, in footnote 2, with reference to § 160, Title 15, said:

"Under the cases of that State, violation of this requirement does not render inadmissible a confession secured during such detention. See Ingram v. State, 252 Ala. 497, 42 So.2d 36. Nevertheless, such an occurrence is 'relevant circumstantial evidence in the inquiry as to physical or psychological coercion.' Stein v. People of State of New York, 346 U.S. 156, 187, 73 S.Ct. 1077, 1094, 97 L.Ed. 1522."

Defendant says:

"The Court must take into account that the chief interrogating officer could not remember many of the factors most relevant to the present inquiry. Furthermore, he was present during only a fraction of the interrogation period, was out of the room when the alleged statements were first elicited (Tr. 212–13) and could not testify as to what methods the other interrogators, (and there were at least three) (Tr. 185–186), employed (Tr. 185–6, 213). Appellant respectfully submits that a careful review of merely that portion of the testimony preceeding (sic) the Court's ruling (Tr. 184–213) indicates that the State did not meet even the minimum burden required by law in laying a predicate for the admission of the alleged inculpatory statements and that the Trial Court erred in allowing their introduction in testimony."

Defendant says that Blake " . . . . was out of the room when the alleged statements were first elicited . . . ." We do not agree that the evidence shows that defendant first made the inculpatory state-

ments at a time when Blake was not present.[1]

It is true that Blake was not present throughout defendant's interrogation and that all officers who took part therein did

1. All the testimony on "(Tr. 212–13)" is as follows:

"Q Lt. Blake I'll ask you whether or not you saw Edward Braggs at the Prichard Police Station on the 20th of July, 1966?

"A Yes sir. I did.

"Q Did you know Edward Braggs by sight?

"A Yes.

"Q Point him out.

"A He's sitting in the center of the table down there.

"Q All right. Now what if anything were you doing at the time you saw him at the police station?

"A He was in the back office of the Detective Division.

"Q Now did you see him again on that same day?

"A Yes sir.

"Q About what time of day or night was it?

"A In the same office, prior to midnight. I can't give you an exact time on the thing. It was 7:00 or 8:00 o'clock. I'm just not sure.

"Q And with whom if anybody was he with at the time you saw him then?

"A Detective J. R. Rigsby of the Prichard Police Department and Detective G. E. Gilbert with the Prichard Police Department.

"Q And was anything said to him by you or by anyone else in your presence at that time?

"A Yes sir.

"Q What if anything was said?

"A There was questions asked him.

"Q And what was said prior to questioning him?

"A All of his rights were explained.

"Q What was said in explaining those rights?

"A That he did not have to make a statement and if he did make a statement that it could be and probably would be used against him in a Court of law. He had a right to have an attorney present during the course of questioning. Also that if he could not afford to hire an attorney the State of Alabama would appoint him an attorney.

"Q All right. Did he appear to understand what you told him?

"A Yes sir. He did.

"Q Did he ask for a lawyer at that time?

"A No sir.

"Q Either a lawyer of his own choosing or an appointed one?

"A No sir.

"Q He did not ask for any lawyer?

"A No sir.

"Q All right. Then what if anything did you do Mr. Blake?

"A After his rights was explained?

"Q Yes.

"A Then I left out of the office and went back into my office.

"Q Then did you see him again that night?

"A Yes sir. Later on that night.

"Q How long after the time that you, how long a period of time had taken place when his rights had been explained until you saw him again?

"A I'd say some hour and ten or an hour and fifteen minutes later he come through my office and then it was about an hour and a half later that I seen him again coming back through my office going to the rear office. I didn't go in at that time. Some 45 minutes later I went back to the rear office on a request from the two detectives.

"Q Now, at any time while you were in that rear office where the Defendant was or in your office did anyone in your presence or you or anyone in your presence offer him any promises or offer of reward or offer of immunity in order to get him to discuss any matter with you?

"A No sir.

"MR. DELANO PALUGHI: Objection. The witness is not competent to testify to that.

"THE COURT: Overrule the objection.

"A No sir.

"Q I'll ask you did you or anyone else make any inducements in order to get him to discuss any matter with you?

"A No sir.

"Q Did you or anybody in your presence threaten him or coerce him or make any force in order to get him to discuss anything with you or with anyone else?

"A No sir.

"Q I'll ask you whether or not anything was said to you by him relative to the geographical location of Allenby Street and Wilson Avenue?

"A Yes sir.

"MR. CRAWFORD: I object."

not testify with respect to defendant's statements as to which Blake testified. Blake did testify, however, that defendant was given adequate warning of his rights and that no one offered threat or inducement to defendant in Blake's presence or within his knowledge. This court has said:

"It was the right of the accused to controvert the predicate evidence preliminary to the introduction of the confession by cross-examination of the State's witnesses or by evidence aliunde, but the State, having established by the preliminary proof the voluntary nature of the confession, was not required to examine every witness present when the confession was made or to array for interrogation every person who might have had access to or conversation with the prisoner during his incarceration in order to remove the prima facie presumption of involuntariness." Logan v. State, 251 Ala. 441, 444, 37 So.2d 753, 755.

█ On consideration of all the circumstances surrounding the making of the statements in the instant case, we are of opinion that error does not appear in the admission of the testimony of the witness Blake with respect to inculpatory statements made by defendant.

### 4.

Defendant says the court erred in admitting into evidence certain hairs taken from defendant's body.

As we understand the evidence, the injury to deceased occurred during the early morning hours of Monday, July 18, 1966. Police Sergeant Reynolds testified that on July 22, 1966, he took down the drapes on the window which had been found partially open. He testified:

"A As I was taking the drapes down on the back side of the drapes which would be facing outside the house I noticed one hair and it was just about—

"MR. CRAWFORD: Object.

"THE COURT: Overruled.

"Q Go ahead.

"A The hair was just about to fall off so I removed it at that time and put it in a little brown envelope and sealed it up to make sure that I wouldn't lose it.

"Q Did it stay in your possession from that time?

"A Yes sir.

"Q Until when?

"A Until I carried it to Dr. Grubbs.

"Q You carried it yourself?

"A Yes sir."

The toxicologist, Dr. Grubbs, testified that the hair found on the drape and the hairs from defendant's body were:

"A The same color, same cross sectional size and generally in a general manner the same type of hair.

"Q They compared with one another?

"MR. DELANO PALUGHI: Objection if it please the Court. The hairs can speak for themselves.

"THE COURT: Overruled.

"A Yes.

"Q And what kind of an analysis did you do on it Dr.?

"A First I examined it microscopically and then I sectioned the hair, that is I cut it in two with a very sharp sectioning instrument and of course I cut the other one and examined those under the comparison microscope to determine if they were of the same general cross section."

Dr. Grubbs testified:

"Q Now when you testified about this hair that you examined you said it was the same color, same size and in general the cross sections were the same.

"A Yes.

"Q Can you positively say this is the same hair?

"A I can't say it's the same from the same individual."

A sample of hair from defendant's alleged companion, Bridges, was also delivered to Dr. Grubbs. With respect to Bridges' hair, Dr. Grubbs testified:

"A There was no similarity between the hair labeled Bridges and the hair that was labeled from the curtain. It just wasn't the same hair."

Defendant contends that the hair from defendant's body was not admissible because the hair was taken in an illegal search and seizure and in deprivation of defendant's right to due process under the Constitution of the United States. Defendant says in brief:

"  .  .  .  . Appellant would urge that the search in the instant case was not conducted in a reasonable manner and its illegality could not be cured by waiver, since, according to the testimony of police Detective Gilbert, no calculation was made as to the pain, embarrassment or indignity suffered by the defendant (Tr. 247-8) c. f. Schmerber v. State of California, 384 U.S. 757, [86 S.Ct. 1826, 16 L.Ed.2d 908], (1966).

"Where consent is claimed, the burden is on the State to show by clear and positive testimony that there was a consent or waiver. The State must show there was no duress or coercion, actual or implied, and that waiver or consent was freely, unequivocally and intelligently given. Bull v. Armstrong, 254 Ala. 390 [48 So.2d 467], Judd v. U. S. [89 U.S. App.D.C. 64], 190 F.2d 649, Channel v. U. S. [9 Cir.], 285 F.2d 217. . . . ."

Detective Gilbert testified as to how the sample of defendant's hair had been obtained as follows:

"Q What if anything did you say to those two men?

"MR. CRAWFORD: Immaterial and irrelevant what he said to them in jail.

"THE COURT: Overruled.

"MR. CRAWFORD: Except.

"A We were in the Detective Room and we advised Braggs and Bridges of their rights, they did not have to give us samples of hairs off their body and also that their hairs may be used against them in a Court of law or it could help them in a Court of law.

"MR. DELANO PALUGHI: It could do what sir?

"A It could help them or hinder them in a Court of law. We could use them in a Court of law.

"Q What if anything was done?

"A Edward Braggs pulled hair out of his head and out of his leg and dropped it in a brown envelope. We sealed it."

Defendant testified that his hair sample was obtained as follows:

"Q You heard the detective said that they plucked hair out of your head. Did you tell them to pluck hair out of your head?

"A No sir.

"Q Who plucked the hair out of your head?

"A Gilbert.

"Q Did you pull it out yourself?

"A No sir.

"Q How did he pull the hair out of your head?

"A He just reached up and snatched it out.

"Q And you didn't do that?

"A No.

"Q Did it hurt?

"A It stung.

"Q It stung. And what if anything else did they do to you? While you were in the Prichard Jail besides pull the hair out of your head?

"A They pulled hair out of my leg.

"Q And what else?

"A That's all.

"Q All right. When did he pull the hair out of your head?

"A Three days later.

"Q Three days later. You had been in jail three days before he pulled the hair out of your head and leg.

"A Yes sir.

"Q Now when did he tell you that you were suspected for murdering Mrs. Rawley Hall?

"A He didn't tell me until the fourth day when he charged me."

■ We are of opinion that, if the court believed the witness Gilbert, the court could find that defendant's hair sample was obtained with his consent, and that it had not been illegally obtained and that it was admissible into evidence. Hubbard v. State, 283 Ala. 183, 215 So.2d 261. Since the court admitted the hair, we presume that the court found that it was obtained with defendant's consent as Gilbert testified. We do not hold that the hair would be admissible if it had been obtained by the officer's snatching it out of defendant's body without his consent.

*5 and 6.*

Defendant says the court erred in denying defendant's motion to exclude the evidence and to give a directed verdict for defendant. The motion came when the state rested.

■ Defendant says the state's evidence failed to support a reasonable inference that a crime had been committed, and that the jury could not, from the evidence presented, reasonably infer the existence of the corpus delicti. Defendant relies on the rule that, in a prosecution for murder, the state must show the corpus delicti independent of incriminating statements allegedly made by defendant, citing Shelton v. State, 217 Ala. 465, 117 So. 8.

Defendant relies on statements in the testimony of the doctors to effect that deceased could possibly have received her skull injury as the result of a fall against the bath tub, lavatory, commode, furniture, or other object, and also the evidence that deceased had been treated by a physician for "a mild type of congestive heart failure." She had complained of her heart beating rapidly.

If it be conceded that it was possible for her to have been injured by a fall as well as by a blow, there remain to be considered, the leaves and debris on her bed, the partly opened window, the tool marks on the window, the blood on the floor and in the bathroom, the $5.00 missing from the son's pants, and the moving of the pants. This evidence, which is independent of any statement by defendant, is sufficient, we think, to support an inference that someone entered the house and struck her, and that such an inference is reasonably more probable than an inference that she fell, struck her head, spread blood around the bathroom, and returned to bed; all without waking the son who was later awakened by her groaning.

We hold that denial of the motion was not error. We are not persuaded that the verdict is contrary to the great weight of the evidence.

*7 and 8.*

■ Defendant argues that the court erred in denying his motion for mistrial on the ground that the prosecuting attorney and witnesses several times referred to the house of deceased as "the scene of the

crime." We are not persuaded that the court's rulings on these motions are cause for reversal.

Neither do we think the court erred to reversal in ruling on the motions on pages 125 or 283 of the transcript.

We are of opinion that reversible error does not appear.

Affirmed.

LIVINGSTON, C. J., and MERRILL and HARWOOD, JJ., concur.