The defendant was indicted and convicted for the murder of his two month old son. Alabama Code 1975, Section 13A-6-2
(Amended 1977). Sentence was 50 years' imprisonment.
 I
The defendant argues that his confession was involuntary because he was exhausted, intoxicated, intimidated and subjected to eight hours of interrogation.
The question of whether a confession is voluntarily made turns on the totality of the circumstances in each particular case. Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138,22 L.Ed.2d 433 (1969); Crawford *Page 1212 v. State, 377 So.2d 145 (Ala.Cr.App.), affirmed, Ex parteCrawford, 377 So.2d 159 (Ala. 1979). The constitutional inquiry into the issue of voluntariness requires more than a mere color matching of cases. Eakes v. State, 387 So.2d 855 (Ala.Cr.App. 1978).
The facts relevant to this issue are that in the early morning hours of Saturday, November 8, 1980, the defendant and his wife took their infant son to the emergency room because the baby had been having "convulsions, fever, breathing difficulties, things like that." The defendant remained at the hospital from 1:20 A.M. until 3:35 A.M. when he took the child home and went to bed.
Saturday night the defendant called the paramedics at approximately 11:55 P.M. because his son was again having difficulty.
The child was found dead in his baby bed at 6:00 Sunday morning when the defendant awoke. That morning, Montgomery Police officers talked to the paramedics and to the defendant and his wife. Investigator Ralph Connor and his partner investigated what they thought was a natural death. They interviewed the defendant regarding the circumstances of the death, and were finished with the defendant around 8:00 or 8:30 that morning. Nothing was told to these investigators about "any kind of injury or blow or anything."
Dr. Thomas Gilchrist performed an autopsy on the infant, Joseph Moore, Jr., beginning at 3:00 Sunday afternoon. Officers B.W. Smith and Allen Blankenship attended this autopsy and learned that the child "had died of a brain hemorrhage suffered by a lick" and that the child had died of "unnatural causes."
At trial, Dr. Gilchrist testified that, although he found no external evidence of injury, internal examination of the infant's head "showed extensive hemorrhage or bruising between the scalp and the skull. Underlying this, there was a fracture or breaking of the bones of the skull at the right back of the head" and one area of the brain itself had been bruised. These injuries "all related to blunt force or blunt trauma to the head." Dr. Gilchrist testified that the infant died of "blunt trauma to the head."
Dr. Gilchrist found "at least two events of injury" to the child's head. The various degrees of healing on the head indicated that some of the injury was several hours to a day old and other damage was four to six days old.
 "Some of the injury, obviously, in my opinion, occurred before twenty-four hours before death because I think it is three or four days old. This injury may or may not have been apparent to the physician (in the emergency room). Other of the injury may well have occurred after that twenty-four hour period because we are talking about approximately several hours."
Dr. Gilchrist also testified as to the degree of force necessary to inflict or cause such an injury.
 "It takes a considerable amount of force to cause such an injury to a child's head. More force than can be applied, say, from dropping a child on the floor, even, say, from a ceiling eight foot high down to a floor eight feet below."
After talking to Dr. Gilchrist, Officer Smith went to the defendant's residence "to pick up the mother and father of the baby to talk to them about what had occurred with the baby." The defendant was located and he and his wife were taken to police headquarters in a patrol car, arriving between 7:05 and 7:10 P.M. Sunday evening. At the hearing on the defendant's motion to suppress, it was apparently undisputed that the defendant was in custody at this time.[1] *Page 1213 
Officer Smith testified that before taking the defendant and his wife to police headquarters, they were advised that "we would like to talk to them at police headquarters, and that we were investigating Joseph Moore, Jr.'s death, and we would like to interview them." The Moores never asked if they could stay — "the question never came up." The Moores were neither told that they had to go nor were they told that they did not have to go.
 "He (defendant) asked us what we were doing there, and we explained to him that we were investigating the death of Joseph Moore, Jr. and we would like to talk to them at police headquarters. And that we would be glad to carry them down in a police vehicle. And they had volunteered to go with us."
Prior to this time, Officer Smith had talked to Investigator Connor and knew that the Moores had taken their child to the emergency room early Saturday morning.
Smith testified that at this time, the defendant did not appear to have been drinking.
At police headquarters, the defendant and his wife were separated. Officer Smith gave the defendant his Miranda
warnings and the defendant signed a waiver of rights form at 7:30 Sunday night, less than thirty minutes after he had arrived at the police department.
In talking with the defendant, Officer Smith stated that "this was more of an interview in my estimation than it was an interrogation." Officer Smith "advised Joseph Moore, Sr. that the baby had died of unnatural causes, and that an autopsy had been performed by Doctor Gilchrist, the extent of the autopsy; and asked him had the baby received any type lick. And at that point, he gave me this statement." Smith began typing this first statement at 8:40 P.M. The defendant signed it at 9:15 P.M.
Prior to the time this first statement was actually taken, the defendant told Officer Smith that he had fallen down a staircase with the baby. Smith called Dr. Gilchrist between 8:00 and 8:10 P.M. to find out if the child's injuries could have been caused by such a fall. Before the defendant signed his statement, Smith told him that it was Dr. Gilchrist's opinion that "it couldn't have happened that way."
After the defendant signed the statement, Officer Smith talked to Dr. Gilchrist for 25-30 minutes at the police station. During this time the defendant was left alone in the interrogation room and there was no one watching him. Smith testified that the defendant "was not in custody" and had not been placed under arrest. Smith "did not feel like it warranted anyone sitting and watching him." The defendant was not told and did not ask if he was free to go.
Sometime after 10:00 P.M., the defendant changed his story and told Officer Smith that he had "slapped at a roachie bug and hit the baby on the head." Smith then went back and conferred with Dr. Gilchrist who said "that the blow that the baby received to the head could not have come from a human hand; not enough force alone."
Around 11:00 or 11:30 P.M., Smith and the defendant took a "break" and Smith bought the defendant a Coca-Cola. Smith told the defendant that he did not feel like the defendant was being truthful. At that point, the defendant told Smith that he wanted to get it off his mind and wanted to tell what really happened.
At approximately 11:45 P.M., the defendant changed his story again. This resulted in a second typewritten statement being signed by the defendant at 2:25 Monday morning. Before this statement was given, the defendant was again warned of his constitutional rights. He signed a written waiver at 1:20 A.M.
Smith testified that the only complaint the defendant ever made was "Did I (Smith) honestly think that he would kill his baby?" The defendant did not tell Smith that "he was sleepy, tired or hungry, or anything like that." The defendant did not appear tired to Officer Smith and Smith did not observe any signs of fatigue about him. The defendant never told Smith that he wanted to go home. *Page 1214 
The defendant was not denied food or drink.
 "Yes, sir, between the first and second statement, I did (offer him food). I did buy him a coca cola. I asked him if he would like a candy bar or anything from downstairs. I let him get approximately two to three drinks of water while he was up there. And I did offer him a cup of coffee when I got a cup of coffee just before we started the second statement."
Although Smith did raise or "slightly elevate" his voice "to express points" he did not "holler" at the defendant.
Sometime during the questioning Officer Smith advised the defendant that "his wife had made the statement that she had heard a noise (a thud) and heard the baby screaming upstairs, and asked him what the noise was." Several times after the defendant give the first statement, Smith told him that he didn't believe it.
Officer Smith testified that he never forced, threatened, or coerced the defendant, and that he made no promises or other inducements in order to get a statement.
The defendant was twenty years old and employed with the City Sanitation Department. He had never been arrested before. He had a ninth grade education and because of this Officer Smith "made it very clear that he understood his constitutional rights." See Berry v. State, 399 So.2d 354 (Ala.Cr.App. 1981).
The defendant presented evidence which revealed that he was extremely tired and highly intoxicated when he was taken into custody.
Although the defendant did not testify at the pretrial suppression hearing, at trial the defendant testified that during the interrogation, he kept "passing out" and that he was "tired, sleepy, worried, hurt and hungry." He denied being informed of his constitutional rights and denied any knowledge of the statements attributed to him.
In order for intoxication to render a confession involuntary and inadmissible, it must be shown that the mind would have been substantially impaired. See Palmer v. State,401 So.2d 266, 267 (Ala.Cr.App.), cert. denied, 401 So.2d 270 (Ala. 1981); Tice v. State, 386 So.2d 1180 (Ala.Cr.App.), cert. denied, Ex parte Tice, 386 So.2d 1187 (Ala. 1980). Here the evidence of whether or not the defendant was intoxicated was disputed.
The age and education of the defendant are merely factors to consider in determining voluntariness, Garrett v. State,369 So.2d 833 (Ala. 1979); Rhine v. State, 360 So.2d 1056
(Ala.Cr.App.), cert. denied, 360 So.2d 1060 (Ala. 1978), as is the fact that the defendant is "confused" or "nervous". Mack v.State, 348 So.2d 524 (Ala.Cr.App. 1977). Another factor to consider is the fact that the defendant was not in full possession of his mental faculties. Sullivan v. State,351 So.2d 659 (Ala.Cr.App.), cert. denied, 351 So.2d 665 (Ala. 1977).
Other factors which must be considered in determining voluntariness, but are not necessarily controlling, are the fact that the defendant was physically weak and under a severe strain, Dennison v. State, 259 Ala. 424, 66 So.2d 552 (1953); the fact that the confession was made late at night or after lengthy interrogation, Hutto v. State, 278 Ala. 416,178 So.2d 810 (1965); Huff v. State, 267 Ala. 282, 100 So.2d 769 (1958);Austin v. State, 56 Ala. App. 307, 321 So.2d 272 (1975). Confronting a suspect with a co-defendant's confession is not an unfair tactic nor is it legally coercive. Gibson v. State,347 So.2d 576 (Ala.Cr.App. 1977); Sharp v. State, 338 So.2d 518
(Ala.Cr.App. 1976); Vander Wielen v. State, 47 Ala. App. 108,251 So.2d 240, cert. denied, 287 Ala. 742, 251 So.2d 246
(1971).
Where the voluntariness inquiry presents conflicting evidence, great weight must be given the trial judge's finding of voluntariness. Even when there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. Thompsonv. State, 347 So.2d 1371, 1375 *Page 1215 
(Ala.Cr.App.), cert. denied, Ex parte Thompson, 347 So.2d 1377
(Ala. 1977), cert. denied, 434 U.S. 1018, 98 S.Ct. 740,54 L.Ed.2d 765 (1978). "The trial court does not have to accept the testimony of (the) defendant as to the voluntariness of a confession if there is substantial testimony by others sufficient to constitute a predicate for the admission in evidence of the confession." Bradley v. State, 337 So.2d 47, 50
(Ala.Cr.App. 1976).
The issue of the admissibility and hence the voluntariness of the statements and the confession in this case turns, as it does in so many others, on the question of which witnesses the trial judge believed. We have reviewed the surrounding circumstances in this case and conclude that the finding of voluntariness by the trial judge is supported by substantial evidence and that consequently there was no error in the admission of the defendant's statements into evidence.
 II
The defendant also maintains that because he was seized and arrested without probable cause his statements and confession were inadmissible under Dunaway v. New York, 442 U.S. 200,99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). See also Taylor v. State,399 So.2d 881 (Ala. 1981); Reynolds v. State, 396 So.2d 1076
(Ala.Cr.App. 1981); Hadley v. State, 391 So.2d 158
(Ala.Cr.App.), cert. stricken, Ex parte Hadley, 391 So.2d 162
(Ala. 1980); Clements v. State, 390 So.2d 1131 (Ala.Cr.App.), cert. denied, Ex parte Clements, 390 So.2d 1136 (Ala. 1980).
However, under the facts of this case we find that the police did have probable cause to arrest the defendant.
As noted earlier in this opinion, there was apparently no dispute at trial that the defendant was in custody, and therefore under arrest under Dunaway, when the police took him to the police department for questioning. When Officer Smith took the defendant into custody, he had already talked with Officer Connor and Dr. Gilchrist. Officer Smith knew that the two month old infant had died an "unnatural" death and that the infant was under the care of the defendant and his wife. Even without additional information we think that these facts are sufficient to support a finding of probable cause. See Flair v.Cox, 402 F. Supp. 818 (M.D.Tenn. 1975), affirmed, 556 F.2d 580 (6th Cir. 1977), where it was held that a police officer who observed an unattended infant at or near a road had probable cause to arrest the infant's father for child neglect.
We also think it reasonable to infer that Officer Smith knew that the defendant had not given Officer Connor any information that would explain or account for the injury and that the injury or injuries to the infant had been inflicted or sustained within the past one to six days. However, the record does not affirmatively reveal that Officer Smith possessed such information and we have not considered these inferences in making our finding of probable cause. It has been observed that the fact that the mother could not give an explanation of how the injuries were inflicted coupled with the knowledge that the dead child was taken from the mother's home would lead a reasonable person to believe that the mother was trying to cover up her involvement in the death of the child, and probable cause would then exist to arrest the mother. People v.Ray, 80 Ill. App.3d 151, 35 Ill.Dec. 688, 399 N.E.2d 977 (1979).
In Knight v. State, 346 So.2d 478 (Ala.Cr.App.), cert. denied, 346 So.2d 483 (Ala. 1977), we held:
 "Probable cause exists where the facts and circumstances within the officer's knowledge and of which he has reasonable trustworthy information are sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed. . . Mere suspicion or good faith on the part of the arresting officer is not sufficient to constitute probable cause for an arrest . . .; common rumor or report, suspicion, or even `strong reason to suspect' is not adequate . . .; more than a good faith suspicion is required. . . ." *Page 1216 
346 So.2d at 481. (citations omitted)
"There is no litmus paper test for determining probable cause, . . . and each case must be determined upon its own facts and circumstances." Hatton v. State, 359 So.2d 822, 829
(Ala.Cr.App. 1977), cert. quashed, 359 So.2d 832 (Ala. 1978)[2];Yeager v. State, 281 Ala. 651, 207 So.2d 125 (1967).
The information possessed by a police officer when he takes a suspect into custody is not required to constitute evidence sufficient to support a conviction. Dolvin v. State,391 So.2d 666, 675 (Ala.Cr.App. 1979), affirmed, 391 So.2d 677 (Ala. 1980).
 "The `probabilities' implied by the term `probable cause' are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. Brinegar, supra (338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). Probable cause does not preclude all room for doubt nor need the officers be absolutely certain and positive that a crime is in the making."
Hatton, 359 So.2d at 829.
United States v. Seay, 432 F.2d 395 (5th Cir. 1970). "(O)nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." Rudolph v. State,371 So.2d 962, 964 (Ala.Cr.App.), cert. denied, Ex parte Stateex rel. Attorney General, 371 So.2d 965 (Ala. 1979). An officer need not possess knowledge of facts sufficient to establish guilt, but more than mere suspicion is required. United Statesv. Matthews, 615 F.2d 1279, 1284 (1980). Probable cause for arrest is a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty, State v.Knapp, 294 So.2d 338, 341 (Fla.App. 1974); see 34 Words and Phrases, "Probable Cause". Probable cause for arrest without a warrant is something less than proof needed to convict and something more than a raw unsupported suspicion; it is a suspicion or belief of guilt that is "well-grounded". State v.Vaughn, 12 Ariz. App. 442, 471 P.2d 744, 746 (1970); State v.Davis, 50 N.J. 16, 231 A.2d 793, 797 (1967).
 "In determining whether the police have probable cause to believe that a felony was being committed so as to justify an arrest without a warrant, the sufficiency of the knowledge of the officers must be determined, not by an analysis of the effect of each known circumstance in isolation, but by a conclusion as to what a reasonable man, knowing all the facts which the officers knew from their investigation, would have believed under these circumstances."
Knapp, 294 So.2d at 341.
Measuring probable cause by the nontechnical yardstick of the reasonably factual and practical considerations of everyday life and common sense, we find that there was probable cause to arrest the defendant.
 III
The defendant argued at trial as he does here that it is impossible for a jury to distinguish between an act which constitutes murder by one recklessly engaging in conduct which creates a grave risk of death under circumstances manifesting extreme indifference to human life (Alabama Code 1975, Section13A-6-2 (a)(2) (Amended 1977)) and an act which only amounts to manslaughter where one recklessly causes the death of another person (Section 13A-6-3 (a)(1)).
The distinction is explained in the commentary to Section13A-6-3.
 "Section 13A-6-2 (a)(1) includes reckless conduct causing death, if it manifests extreme indifference to human life. `What amounts to such extreme indifference depends upon the circumstances of the particular case, but some special heinousness must be manifested. Recklessly causing death, without more, is manslaughter *Page 1217 
(Section 13A-6-2 (a)(1)).' Commentary, Michigan Revised Criminal Code, Section 2015."
The comprehensibility by a jury of the distinction between reckless conduct as murder or manslaughter has tacitly been recognized by the courts of this state. Gautney v. State,284 Ala. 82, 222 So.2d 175 (1969); Napier v. State, 357 So.2d 1001
(Ala.Cr.App. 1977), reversed, 357 So.2d 1011 (Ala. 1978);Langford v. State, 354 So.2d 297 (Ala.Cr.App.), reversed,354 So.2d 313 (Ala. 1977).
A diligent and thorough search of the record reveals that the objection raised in Northington v. State, 413 So.2d 1169
(Ala.Cr.App. 1981), was not made in the trial court and is not argued or presented to this Court on appeal. This Court will not consider on appeal any constitutional questions not raised below. Steele v. State, 289 Ala. 186, 266 So.2d 746 (1972). Matters not objected to at the trial level cannot be considered for the first time on appeal. Bridges v. State, 391 So.2d 1086
(Ala.Cr.App. 1980).
The judgment of the Circuit Court is affirmed.
AFFIRMED.
All Judges concur.
[1] From the record:
 "THE COURT: . . . Is there any real contention that the Moores weren't in custody at this time?
 "MR. RIGGS (Defense Counsel): Yes, Sir. Is there no contention that they were in custody?
 "MR. GILLIS (Assistant District Attorney): Your Honor, we don't have any problem with that."
 In brief, the Attorney General states: "Later that day at approximately 6:30 P.M., the Appellant was taken into custody by investigators. . . ." App. Brief, p. 4.
[2] The amount of evidence required for probable cause to arrest and for probable cause to search is generally the same. Nikolicv. State, 384 So.2d 1141, 1148 (Ala.Cr.App.), cert. stricken,Ex parte Nikolic, 384 So.2d 1151 (Ala. 1979).