399 So.2d 875 (1980)
Omar TAYLOR
v.
STATE.
3 Div. 118.
Court of Criminal Appeals of Alabama.
May 27, 1980.
Rehearing Denied June 17, 1980.
*876 Robert M. Beno, Montgomery, for appellant.
Charles A. Graddick, Atty. Gen., and Samuel J. Clenney, III, Asst. Atty. Gen., for appellee.
HARRIS, Presiding Judge.
Appellant was convicted of robbery and the trial court sentenced him to thirty years in the penitentiary. At arraignment, in the presence of his counsel, he interposed a plea of not guilty and not guilty by reason of insanity. Appellant did not testify in the case in chief and he offered no evidence under his special plea of not guilty by reason of insanity.
Appellant filed a pretrial motion seeking to have his confession suppressed and his arrest declared illegal. A full blown hearing was held on this motion and much testimony was taken. At the conclusion of the hearing the motion to suppress was overruled and denied.
On December 2, 1978, three black males entered Moseley's Grocery Store located at the intersection of West Jeff Davis Street and Cleveland Avenue at approximately 7:00 p. m. They had previously entered into an agreement to rob the store. There had been a number of robberies in this area of the city of Montgomery in recent weeks and the police officers had initiated an intensive manhunt in an effort to apprehend the robbers. They interviewed a number of suspects in the course of which they learned that appellant might be involved in the robbery of Moseley's Grocery Store. According to one of the investigating officers the information that appellant might have been involved in the robbery came from a jail inmate who was a suspect in the same robbery. Charles Martin was in custody charged with rape and robbery in an unrelated case.
At the suppression hearing Police Officer R. D. Mobley testified that he had numerous conversations with Martin in the course of which Martin told Mobley he had information that appellant was involved in the robbery of the Moseley Grocery Store. Mobley stated that Martin, "didn't tell me how he got it. I don't know how he got it. He did not go into any details or who told him or when or where he obtained the information, but only that he was involved in a robbery ... He said that he had heard that Omar Taylor was involved in the robbery of Moseley's Grocery. What part he took, he doesn't know."
The trial court was concerned about the credibility and reliability of Mobley's informant and officer Mobley was questioned along this line and replied, "I do not know him that well. I know I arrested him. He has never given me any information before, so I do not know."
From the record:
"Q. So, what you are saying, then, based on what he told you, he had no way of knowing other than what he had heard from someone else whether or not the defendant (Taylor) may or may not have been involved in this robbery? In other words, he had to believe his source in order to give you the information he had.
"A. Yes, sir, as far as I know. I don't know how he knew. I don't know if he was a party to the robbery his self. (sic) He was a suspect to me at that time ... He did not go into any details or who told him or when or where he obtained the information, but only that he was involved in a robbery.
"Q. Was there anything other than your personal suspicion and based on your conversation with him previously, was there any reason or foundation for which you could believe the defendant (sic)? Were *877 there anydid he give you any places where you may be able to find the money or find any of the weapons or any other element which might give credibility to his statements?
"A. No, sir. He didn't say anything else other than the fact that he knew that Omar Taylor was involved in the robbery. He didn't know where the money, gun or anything else was."
Officer Mobley did not arrest appellant. He referred the information which he had received from inmate Charles Martin to two other officers assigned to the Robbery and Homicide Division of the Montgomery Police Department. These two officers arrested appellant without a warrant on January 4, 1979, at approximately 3:00 p. m., as he emerged from a pool hall on Holt Street. The arrest was based solely on the information furnished them by Officer Mobley following his interview with Charles Martin as set forth above. Upon arresting appellant they informed him who they were and told him that he was being arrested in connection with the robbery that occurred at Moseley's Grocery and Meat Market. They searched him for weapons prior to putting him in the patrol car and transported him to the station house and surrendered him to other detectives for questioning. After appellant was placed in the patrol car one of the officers, from memory, recited to him his constitutional rights. One of the arresting officers, Sergeant Ed Alford, testified that the arrest was made on information furnished by other investigators in the Robbery Division who had interviewed Charles Martin. Acting on this information appellant was arrested without a warrant as the officer felt that it was necessary to pick him up and check him out. He was asked if he felt the information was sufficient to arrest appellant and he replied, "Well, I did not know because I had never seen him." He was asked if there was any basis on which the credibility of Charles Martin could be established and he answered, "I did not attempt to establish any credibility on him." Officer Alford further stated that the arrestee was not asked if he understood the rights given him and he replied, "I did not ask him anything concerning his rights. I just advised him of his rights."
Mr. and Mrs. John Moseley were in the store on the night of December 2, 1978, when the robbery occurred. Mr. Moseley was at the cash register checking out customers and Mrs. Moseley was in the office near the back of the store when she observed two black men enter the store. One of the robbers entered the office and pulled a pistol on Mrs. Moseley and said, "This is a stick up. Give me all the money in the safe." She told him there was no money in the safe. He again demanded the money and she told him that the safe was old and was not in use any more. He grabbed her by the collar of her coat and forced her from the office and told her to go to the back of the store. As she was leaving the office she looked in the direction of the check-out register and saw her husband and an employee with their hands in the air and another black man pointing a pistol at them. Shortly thereafter she saw two black men exit the store.
Mr. Moseley testified that just before closing time a black man, approximately five feet, five inches tall, came to the check-out counter and placed on the counter a two pound bag of Domino sugar and a package of Zeigler hot dogs. He asked for some lighter flints and when Mr. Moseley turned back around the man was standing there pointing a pistol at him. Mr. Moseley was ordered to open the cash register and give him all the money. Mr. Moseley flipped open the register and the bandit got the money himself. The amount was $600.00. The bandit then asked for his wallet and Mr. Moseley told him he did not have a wallet. With the pistol still pointed at Mr. Moseley the man again ordered him to produce his wallet. Mr. Moseley then reached in his back pocket and got his wallet which contained eight or nine hundred dollars in large bills and handed the wallet to the man. The man immediately ran from the store. The packages of sugar and hot dogs remained on the counter where the robber had placed them. Mr. Moseley then called the Police Department to report the robbery.
*878 Mr. and Mrs. Moseley were unable to identify either one of the three black men engaged in the robbery at the lineup or in court. The officers were careful in picking up the packages of sugar and hot dogs to process them for latent fingerprints. The fingerprints turned out to be those of appellant and there is no contention to the contrary. The interrogating officers informed appellant that his fingerprints were found on the bags of sugar and hot dogs and he subsequently signed a waiver of rights form and executed a written confession. The proper predicates were laid and the waiver of counsel form as well as the signed confession were admitted into evidence.
Appellant does not question the voluntariness of his confession because it was shown without dispute that he was given the Miranda rights and warnings. It was also shown without dispute that no promises, threats, coercion, rewards or hopes thereof were made or held out to him to induce him to make and sign the confessions admitted into evidence. On the other hand appellant contends that he was illegally arrested without probable cause and without an arrest warrant and was involuntarily transported to the station house for interrogation which led to his confession. He urges this court to reverse his conviction on authority of the opinion of the Supreme Court of the United States in Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). A careful reading of the opinion in Dunaway, supra, convinces us that it is controlling and this case must be reversed and remanded. We are left with no other choice.
The facts in this case leading to the arrest and detention of appellant and the facts leading to the arrest and detention of Dunaway are basically indistinguishable. In both cases the information was supplied by a jail inmate awaiting trial on unrelated unsolved crimes but the information supplied was insufficient to obtain an arrest warrant. Nevertheless, other detectives were ordered to pick up the suspects and bring them in for questioning. In each case the suspects were picked up and transported to the station house and placed in an interrogation room where each was questioned by officers after being given the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Both waived counsel and eventually made statements that incriminated them in the crimes. Both filed motions to suppress the statements (and in Dunaway the sketches of the crime sceneand in appellant's case the fingerprints he left on the packages of sugar and hot dogs) which were denied and both were convicted.
In Dunaway, supra, the court held:
"The central importance of the probable cause requirement to the protection of a citizen's privacy afforded by the Fourth Amendment's guarantees cannot be compromised in this fashion. `The requirement of probable cause has roots that are deep in our history.' ... Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that `common rumor or report, suspicion, or even "strong reason to suspect" was not adequate to support a warrant for arrest.' The familiar threshold standard of probable cause for Fourth Amendment seizures reflects the benefit of extensive experience accommodating the factors relevant to the `reasonableness' requirement of the Fourth Amendment, and provides the relative simplicity and clarity necessary to the implementation of a workable rule."
The court relied on some quotes from Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 and Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 and went on to say:
"These passages from Davis and Brown reflect the conclusion that detention for custodial interrogation regardless of its labelintrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest. We accordingly hold that the Rochester police violated the Fourth and Fourteenth Amendments when, without probable cause, they *879 seized petitioner and transported him to the police station for interrogation."
But there is more:
"There remains the question whether the connection between this unconstitutional police conduct and the incriminating statements and sketches obtained during petitioner's illegal detention was nevertheless sufficiently attenuated to permit the use at trial of the statements and sketches. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).
"The New York courts have consistently held, and petitioner does not contest, that proper Miranda warnings were given and that his statements were `voluntary' for purposes of the Fifth Amendment. But Brown v. Illinois, supra, settled that `[t]he exclusionary rule, ... when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth,' 422 U.S., at 601, 95 S.Ct., at 2260, and held therefore that `Miranda warnings, and the exclusion of a confession made without them, do not alone sufficiently deter a Fourth Amendment violation.' Ibid.
"`If Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted.... Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving Miranda warnings.' Id., at 602, 95 S.Ct., at 2261.
"Consequently, although a confession after proper Miranda warnings may be found `voluntary' for purposes of the Fifth Amendment, this type of `voluntariness' is merely a `threshold requirement' for Fourth Amendment analysis, 422 U.S., at 604, 95 S.Ct., at 2262. Indeed, if the Fifth Amendment has been violated, the Fourth Amendment issue would not have to be reached.
"Beyond this threshold requirement, Brown articulated a test designed to vindicate the `distinct policies and interests of the Fourth Amendment.' Id., at 602, 95 S.Ct., at 2261. Following Wong Sun, the Court eschewed any per se or `but for' rule, and identified the relevant inquiry as `whether Brown's statements were obtained by exploitation of the illegality of his arrest,' id., at 600, 95 S.Ct., at 2260; see Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Brown's focus on `the causal connection between the illegality and the confession,' 422 U.S., at 603, 95 S.Ct., at 2261, reflected the two policies behind the use of the exclusionary rule to effectuate the Fourth Amendment. When there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts.

"Brown identified several factors to be considered `in determining whether the confession is obtained by exploitation of an illegal arrest[:] [t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances,... and, particularly, the purpose and flagrancy of the official misconduct ... And the burden of showing admissibility rests, of course, on the prosecution.' Id., at 603-604, 95 S.Ct., at 2261-62. Examining the case before it, the Court readily concluded that the State had failed to sustain its burden of showing the confession was admissible. In the `less than two hours' that elapsed between the arrest and the confession `there was no intervening event of significance whatsoever.' Ibid. Furthermore, the arrest without probable cause had a `quality of purposefulness' in that it was an `expedition *880 for evidence' admittedly undertaken `in the hope that something might turn up.' Id., at 605, 95 S.Ct., at 2262.
"The situation in this case is virtually a replica of the situation in Brown. Petitioner was also admittedly seized without probable cause in the hope that something might turn up, and confessed without any intervening event of significance. Nevertheless, three members of the Appellate Division purported to distinguish Brown on the ground that the police did not threaten or abuse petitioner (presumably putting aside his illegal seizure and detention) and that the police conduct was `highly protective of defendant's Fifth and Sixth Amendment rights.' 61 A.D.2d, at 303, 402 N.Y.S.2d, at 493, [People v. Dunaway, 61 App.Div.2d 299, 402 N.Y.S.2d 490]. This betrays a lingering confusion between `voluntariness' for purposes of the Fifth Amendment and the `causal connection' test established in Brown. Satisfying the Fifth Amendment is only the `threshold' condition of the Fourth Amendment analysis required by Brown. No intervening events broke the connection between petitioner's illegal detention and his confession. To admit petitioner's confession in such a case would allow `law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the `procedural safeguards' of the Fifth.'"
If the situation in Dunaway is virtually a replica of the situation in Brown, as noted by the Supreme Court, then the situation in the instant case is a replica of both Dunaway and Brown.
Section 200.08 of McElroy's Alabama Evidence, Third Edition, Gamble, reads as follows:
"It has been said that the irrefutable rule in this state is that even if an individual is illegally detained, such detention in itself does not render a confession, obtained during such detention, involuntary and inadmissible. This holds true whether the accused was arrested without probable cause, without a warrant or whether he was detained beyond the time by which he should have been taken before a committing magistrate."
Eleven cases from this court and the Supreme Court of Alabama are cited in footnotes under the above quotation. Doubtless there are many more such cases since this Third Edition was published in 1977. For the Bench and Bar to rely on such cases in the future will be extremely dangerous in the light of Dunaway v. New York, supra.
We are loath to reverse a case where the guilt of the accused is so clear and convincing and the guilt drips from the fingers of both hands, but our path is lighted in Dunaway and we are bound to follow this path.
The judgment of conviction is reversed and remanded on authority of Dunaway, supra.
REVERSED AND REMANDED.
All the Judges concur, except DeCARLO, J., who dissents with opinion.
DeCARLO, Judge, dissents.
The United States Supreme Court in Dunaway v. New York, supra, reiterated the test laid down in Brown v. Illinois, supra, which articulates several factors that should be considered in determining the question; "[W]hether the connection between this unconstitutional police conduct and the incriminating statements and sketches obtained during petitioner's illegal detention was nevertheless sufficiently attenuated to permit the use at trial of the statements and sketches." Those factors are: (1) the temporal proximity of the arrest and the confession; (2) the presence of intervening circumstance; (3) and particularly, the purpose and flagrancy of the official misconduct.
The situation in the case involving the appellant, Omar Taylor, is distinguishable from that in the case of Dunaway v. New York, supra, because, in Dunaway, the accused made a statement within two hours after interrogation in the absence of an intervening circumstance which would have lessened the connection between his illegal *881 detention and confession. In Dunaway, no "intervening circumstance" was present from the time the officers received the inmate's hearsay information, to the time Dunaway rendered incriminating statements and sketches.
In the case involving Omar Taylor, the officers, prior to receiving any information from the inmate, did have in their possession fingerprints taken from the bag of sugar and the hotdogs present at the time of the robbery. Further, at the time the officers picked up Taylor, they had no other information from which an investigation could be commenced, other than the inmate's allegation. The officers could not, at that time, determine the authenticity of the inmate's statement concerning the appellant, Taylor, without a fingerprint comparison. Under these circumstances, it was reasonable for these officers to take Taylor into custody and to determine whether or not he was, in fact, the robber.
As the opinion reflects, prior to making any statement, Taylor was told by the interrogating officers that his fingerprints were found on the bag of sugar and on the bag of hotdogs, and it was after he had learned this information that he signed a waiver of rights form and executed a confession.
It was reasonable for the officers to investigate the information they had received because they were able to verify that information by comparison of fingerprints. The officers in Dunaway did not have an "intervening circumstance," fingerprint evidence for comparison, which lessened the connection between the alleged misconduct by the police and the confession of the defendant.
Therefore, in my judgment based on the foregoing facts, it can not be said that the officers in the present case were engaged in an "expedition for evidence." There existed in the case before us an intervening circumstance, that is, the fingerprint evidence. This "intervening circumstance" sufficiently attenuated any alleged unconstitutional conduct by the police so that the appellant's inculpatory statements were admissible.
For the foregoing reasons, I respectfully dissent.