We granted certiorari to review the decision of the Court of Criminal Appeals in Taylor v. State, 399 So.2d 875 (Ala.Cr.App. 1980), which reversed the trial court decision. The principal issue presented for our consideration is whether the trial court erred in admitting the fingerprints and confession of the defendant, Omar Taylor. We hold that the evidence was properly admitted, and we reverse the decision of the Court of Criminal Appeals.
At approximately 7:00 p.m. on December 2, 1978, two males entered and robbed Moseley's Grocery Store at the intersection of West Jeff Davis Street and Cleveland Avenue. There had been a number of robberies in this area of Montgomery in recent weeks, and the police initiated an intensive manhunt in an effort to apprehend the culprits. A number of suspects were interviewed, and during the course of the interviews it was learned that Appellant might be involved in the robbery of Moseley's Grocery Store. According to one of the investigating officers, the information linking Appellant to the robbery came from a jail inmate, Charles Martin, who was himself a suspect in the same robbery. Martin was in custody, charged with rape and robbery in an unrelated case.
At a suppression hearing, Police Officer R.D. Mobley testified that during numerous conversations with Martin, he told the officer he had information that Appellant was involved in the robbery of Moseley's Grocery Store. Mobley stated: "[Martin] didn't tell me how he got it. I don't know how he got it. . . . He did not go into any details or who told him or when or where he obtained the information, but only that he was involved in a robbery. . . . He said that he had heard that Omar Taylor [Appellant] was involved in the robbery of Moseley's Grocery. What part he took, he doesn't know."
Officer Mobley did not arrest Appellant. He referred the information which he had received from Martin to two other officers assigned to the Robbery-Homicide Division of the Montgomery Police Department, and these two officers arrested Appellant without a warrant on January 4, 1979. The arrest was based on the information furnished them by Officer Mobley following his interview with Martin.
Upon arresting Appellant, the officers informed him who they were and told him that he was being arrested in connection with the robbery of Moseley's Grocery. After Appellant was placed in the patrol car, one of the officers recited to him his constitutional rights, and, upon arriving at the station house, Appellant was surrendered to other detectives for questioning.
Sergeant Ed Alford, one of the arresting officers, testified that the arrest was made on information furnished by another investigator in the Robbery-Homicide Division *Page 883 
who had interviewed informant Martin. Based on this information, Appellant was arrested without a warrant, as the officer felt it necessary to pick him up and check him out. When asked if he felt his information was sufficient to arrest Appellant, he replied, "Well, I did not know because I had never seen him." Asked if there was any basis on which the credibility of Martin could be established, he answered, "I did not attempt to establish any credibility on him."
Mr. and Mrs. John Moseley were in their store on the night of December 2, 1978, when the robbery occurred. Mr. Moseley was at the cash register checking out customers and Mrs. Moseley was in the office near the back of the store when she observed two men come in. One of the men entered the office, pulled a pistol on Mrs. Moseley and said, "This is a stick up. Give me all the money in the safe." When she told him there was no money in the safe, he repeated the demand, whereupon she told him that the safe was old and was not in use. He grabbed her by her collar, forced her from the office, and told her to go to the back of the store. As she was leaving the office, she glanced in the direction of the check-out register and saw her husband and an employee with their hands in the air and another man pointing a pistol at them. Shortly thereafter, she saw two men exit the store.
Mr. Moseley testified that just before closing time a man, approximately five feet, five inches tall, came to the checkout counter with a two-pound bag of Domino sugar and a package of Zeigler hot dogs. He then asked for some lighter flints. Mr. Moseley turned away to get the flints, and when he turned back around, the man pointed a pistol at him and ordered him to open the cash register. Mr. Moseley flipped open the register, from which the bandit took $600.00. The bandit then demanded his wallet. Mr. Moseley told him he did not have a wallet. When the man again ordered him to produce his wallet, Mr. Moseley then reached in his back pocket and got his wallet which contained eight or nine hundred dollars. He handed the wallet to the robber. The man immediately ran from the store, but left the packages of sugar and hot dogs on the counter. Mr. Moseley then called the police.
Mr. and Mrs. Moseley were unable to identify either of the men engaged in the robbery, either at a line-up or in court. Fingerprints on the sugar and weiners turned out to be those of Appellant. This fact was undisputed. The interrogating officers informed Appellant that his fingerprints were found on the bags of sugar and hot dogs. Subsequently, he signed a waiver of rights form and executed a written confession. The form and signed confession were later admitted into evidence.
Appellant does not question the voluntariness of his confession, as it was shown to have been given in compliance with Miranda. Additionally, no promises, threats, coercion, rewards or hopes thereof were made or held out to Appellant to induce him to make and sign the confession. Appellant contends, however, that he was illegally arrested without probable cause and without an arrest warrant, and was involuntarily transported to the station house for interrogation which thereafter led to his confession.
The United States Supreme Court, in Brown v. Illinois,422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), held that the question of whether a confession has been purged of the taint of an illegal arrest under Wong Sun v. United States,371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), "must be answered on the facts of each case." 422 U.S. at 603, 95 S.Ct. at 2261. We are of the opinion that the facts in the case before us fall somewhere between those surrounding the confession in Wong Sun, where the Court held that the connection between Wong Sun's unlawful arrest and his statement "had become so attenuated as to dissipate the taint," 371 U.S. at 491, 83 S.Ct. at 419, quoting Nardone v. United States, 308 U.S. 338, 341,60 S.Ct. 266, 267, 84 L.Ed. 307 (1939), and those in Dunaway v. NewYork, 442 U.S. 200, 99 S.Ct 2248, 60 L.Ed.2d 824 (1979), Brownv. Illinois, *Page 884 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and Davis v.Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676
(1969), where the Court held that the confessions were tainted by the unlawful arrests. We must therefore determine on which side of the line separating admissible confessions from inadmissible ones the confession of Omar Taylor falls.
In Dunaway, the petitioner was arrested without probable cause in hopes that something would "turn up." 442 U.S. at 218,99 S.Ct. at 2259. Less than an hour after he reached the police station, after being informed of his Miranda rights, he waived counsel and made the first of two statements and drew sketches that eventually incriminated him. 442 U.S. at 203,99 S.Ct. at 2251. Between the time of Dunaway's arrest and that of his confession, "no intervening event of significance whatsoever" took place. 442 U.S. at 218, 99 S.Ct. at 2259.
Brown contained facts similar to those in Dunaway. Petitioner Brown was arrested without probable cause and made a statement shortly thereafter. The State of Illinois argued that theMiranda warnings were sufficient to attenuate the taint of the illegal arrest. The Court held that "[t]he Miranda warnings are an important factor . . . in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered." 422 U.S. at 603,95 S.Ct. at 2261. Three additional factors were then set out by the Court to aid in determining whether the taint of an illegal arrest has been attenuated. They are: "[1] [t]he temporal proximity of the arrest and the confession, [2] the presence of intervening circumstances, and . . . [3] the purpose and flagrancy of the official misconduct." Id. at 603-04,95 S.Ct. at 2261-62 (citations omitted).
In Davis, the police in Meridian, Mississippi, without warrants, picked up 24 Negro youths over a period of 10 days and took them to police headquarters, where they were questioned briefly, fingerprinted, and then released without being charged. 394 U.S. at 722, 89 S.Ct. at 1395. Davis was subsequently arrested, without a warrant and without probable cause, and fingerprinted again. The second set of fingerprints, along with the fingerprints of 23 others, was sent to the FBI for comparison with prints taken from the scene of the crime.Id. The FBI matched Davis's prints to those of the perpetrator of the crime, and he was indicted. Id. at 723,89 S.Ct. at 1395. The Court held that the fingerprints should be suppressed as the fruit of an illegal arrest. Id. at 728,89 S.Ct. at 1398.
The Court held in Wong Sun, however, that where the defendant was lawfully arraigned and released on his own recognizance, and several days later voluntarily returned to the police station and made a statement, the taint had been attenuated.371 U.S. at 491, 83 S.Ct. at 419. On the other hand, statements made by Toy, another defendant in the case, at the time he was illegally arrested, and contraband seized during his arrest, were suppressible, since the statement did not result from "an intervening independent act of free will." Id. at 486,83 S.Ct. at 416.
While there admittedly has not been the same degree of attenuation here as in Wong Sun, neither is the statement as closely connected to the illegal arrest as in Dunaway, Brown, and Davis. Taylor had been under arrest for more than six hours when he made his statement. During that time he had been allowed to converse privately with his girlfriend and a male companion. He had been given his Miranda rights on three separate occasions. Additionally, subsequent to Taylor's arrest but prior to his confession, an arrest warrant was filed based on a comparison between his fingerprints and those found at the scene of the crime. In Johnson v. Louisiana, 406 U.S. 356,92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), the Supreme Court held that where, prior to a line-up, the defendant was brought before a committing magistrate who advised him of his rights and set bail, the line-up was "sufficiently distinguishable to be purged of the primary taint." Id. at *Page 885 
365, 92 S.Ct. at 1626. Since a similar finding of probable cause separated the arrest and confession of Omar Taylor, it would seem that the taint has been purged here as it was inJohnson.
The exclusionary rule is especially harsh in situations such as this, where the motion to suppress involves a confession that is admittedly voluntary and where Miranda rights were given, not just once, but three times. The development of the rule reveals that it is a "judicially created means of effectuating the rights secured by the Fourth Amendment," Stonev. Powell, 428 U.S. 465, 482, 96 S.Ct. 3037, 3046,49 L.Ed.2d 1067 (1976), rather than a constitutionally required sanction. It is not coextensive with the fourth amendment. Wolf v.Colorado, 338 U.S. 25, 29, 69 S.Ct. 1359, 1362, 93 L.Ed. 1782
(1949).
The roots of the rule can be found in Boyd v. United States,116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). In that case the Court held that the federal government could not subpoena incriminating documents from criminal defendants.116 U.S. at 638, 6 S.Ct. at 536. The Court stated:
 Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other.
Id. at 630, 6 S.Ct. at 532.
Twenty-eight years later, in Weeks v. United States,232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), the Supreme Court made a definitive ruling that evidence seized by federal agents in violation of the fourth amendment was inadmissible in federal court. If evidence may be seized illegally and placed into evidence, the Court held, the fourth amendment "might as well be stricken from the Constitution." Id. at 393,34 S.Ct. at 344. At that time, however, the fourth amendment was not thought to be applicable to the states. Id. at 398,34 S.Ct. at 344.
Silverthorne Lumber Co. v. United States, 251 U.S. 385,40 S.Ct. 182, 64 L.Ed. 319 (1920), went one step further thanWeeks and Boyd. In Silverthorne, the Court held not only that evidence illegally seized must be excluded in federal court, but also that a prosecutor may not admit copies of the evidence made while it was unlawfully in his possession, nor may knowledge gained from the unlawfully seized evidence be the basis of a search warrant. Id. at 392, 40 S.Ct. at 182. The evidence, however, did not become "sacred and inaccessible," but could be obtained "[i]f knowledge of [it] is gained from an independent source." Id. The Court stated that "[t]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all."Id.
The Court held for the first time, in Wolf v. Colorado,338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), that the fourth amendment applies to the states. There the Court said that "[t]he security of one's privacy against arbitrary intrusion by the police . . . is basic to a free society." Id. at 27,69 S.Ct. at 1361. The Court further stated that the fourth amendment is "implicit in the concept of ordered liberty," and therefore is "enforceable against the States through the Due Process Clause." Id. at 27-28, 69 S.Ct. at 1361-62. The Court declined, however, to apply the exclusionary rule to the states, holding that "the ways of enforcing such a basic right raise questions of a different order," Id. at 28,69 S.Ct. at 1361, and that "it is not for this Court to condemn as falling below the minimum standards assured by the Due Process Clause a State's reliance upon other methods which, if consistently enforced, would be equally effective." Id. at 31,69 S.Ct. at 1362.
The Wolf holding was reinforced in Irvine v. California,347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954), but the Court indicated there that violation of an individual's fourth amendment rights by state officials *Page 886 
might constitute a crime under federal statutory law. Id. at 137, 74 S.Ct. at 385. Mr. Justice Jackson, writing for a plurality, directed the Clerk of the Supreme Court to "forward a copy of the record in this case, together with a copy of this opinion, for attention of the Attorney General of the United States." Id. at 138, 74 S.Ct. at 386. However, two of the four Justices making up the plurality did not join in this directive. Id.
In Rea v. United States, 350 U.S. 214, 76 S.Ct. 292,100 L.Ed. 233 (1956), an injunction was sought against a federal agent who proposed to testify in state court as to evidence gained through an illegal search and seizure. Id. at 216,76 S.Ct. at 293. The Court directed that the injunction be granted, basing its ruling on its "supervisory powers over federal law enforcement agencies." Id. at 217, 76 S.Ct. at 294. The exclusionary rule, however, was still not made applicable to the states.
The so-called "silver platter doctrine" was overruled inElkins v. United States, 364 U.S. 206, 80 S.Ct. 1437,4 L.Ed.2d 1669 (1960). Although federal agents could not use evidence they themselves had seized unlawfully, evidence given to them by state officials could be admitted into federal court, regardless of how it had been obtained. The evidence was thus handed to federal agents on a "silver platter." The exclusionary rule was still not applied to the states, but the Court did hold that the exclusionary rule was the "only effectively available way" to deter law enforcement officials from violating the fourth amendment. Id. at 217,80 S.Ct. at 1444.
The exclusionary rule was finally applied to the states the next year, in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684,6 L.Ed.2d 1081 (1961). There the Court held that it was "clos[ing] the only courtroom door remaining open to evidence secured by official lawlessness in flagrant abuse of that basic right, reserved to all persons as a specific guarantee against that very same unlawful conduct." Id. at 654-55,81 S.Ct. at 1691-92. The Court found that in so holding it ended the practice of federal agents "step[ping] across the street to the State's attorney with their unconstitutionally seized evidence." Id. at 658, 81 S.Ct. at 1693. The Court cited Irvine
for the proposition that "[t]he obvious futility of relegating the Fourth Amendment to the protection of other remedies has . . . been recognized by this Court since Wolf." Id.367 U.S. at 652-53, 81 S.Ct. at 1690-91.
The exclusionary rule has been highly criticized, both from within and without the United States Supreme Court. The justification for the rule is generally stated to be deterrence. Stone v. Powell, 428 U.S. 465, 486, 96 S.Ct. 3037,3048, 49 L.Ed.2d 1067 (1976). Early cases also set out the preservation of "judicial integrity" as a justification for the rule, but this theory has been largely abandoned. Id. at 485,96 S.Ct. at 3048. See, United States v. Peltier, 422 U.S. 531,95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). The exclusionary rule is more or less unique to the United States among common law countries. Bivens v. Six Unknown Named Agents of the FederalBureau of Narcotics, 403 U.S. 388, 415, 91 S.Ct. 1999, 2014,29 L.Ed.2d 619 (1971) (Burger, C.J., dissenting). See, Kuruma v.The Queen, [1955] A.C. 197. See generally "The Exclusionary Rule under Foreign Law," 52 J.Crim. L.C. P.S. 271 (1961). Laymen generally view the exclusionary rule as a "technicality" that releases known criminals into society. See Wilkey, "The Exclusionary Rule: Why Suppress Valid Evidence?" 62 Judicature 214, 223 (1978). Evidence suppressed under the fourth amendment is not inherently unreliable, as are involuntary confessions, suppressed under the fifth amendment, and unduly suggestive lineups, suppressed under the fifth and sixth amendments. See, Oaks, "Studying the Exclusionary Rule in Search and Seizure," 37 U. of Chi.L.Rev. 665, 737-38 (1970). Additionally, the Court has consistently ruled that a criminal defendant may be forcibly abducted from another state or country and brought into a jurisdiction to stand trial. Frisbie v. Collins,342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). Also see Oaks,supra, at 669. By refusing to bring out the whole truth, critics have charged, the courts allow *Page 887 
the truth to be completely distorted. "Undeniable facts, of the greatest importance, are forever barred. . . ." Wilkey, supra, at 222.
One of the more compelling criticisms leveled against the rule is that it does not accomplish the stated objective, i.e., deterrence. In 1960, when some states were still operating without the exclusionary rule, the United States Supreme Court stated in Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437,4 L.Ed.2d 1669 (1960), that "[e]mpirical statistics are not available to show that the inhabitants of states which follow the exclusionary rule suffer less from lawless searches and seizures than do those of states which admit evidence unlawfully obtained." Id. at 218, 80 S.Ct. at 1444. See also,Irvine v. California, 347 U.S. 128, 136, 74 S.Ct. 381, 385,98 L.Ed. 561 (1954), where the Court said, "There is no reliable evidence known to us that inhabitants of those states which exclude the evidence suffer less from lawless searches and seizures than those of states that admit it." Chief Justice Burger further developed this idea in his dissenting opinion inBivens v. Six Unknown Named Agents of the Federal Bureau ofNarcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, C.J., dissenting). There he stated that the effect of the exclusionary rule on police conduct is lessened by the long time lapse between the original police action and the final judicial evaluation. The Chief Justice surmised that "[g]iven a policeman's pressing responsibilities, it would be surprising if he ever becomes aware of the final result after such a delay." 403 U.S. at 417, 91 S.Ct. at 2015. Additionally, Burger continued, "[T]he exclusionary rule's deterrent impact is diluted by the fact that there are large areas of police activity that do not result in criminal prosecutions."403 U.S. at 417-18, 91 S.Ct. at 2015-16. There are several motivations that prompt arrests and searches and seizures by police other than criminal prosecution. These include:
 [1] arrest or confiscation as a punitive sanction (common in gambling and liquor law violations), [2] arrest for the purpose of controlling prostitutes and transvestites, [3] arrest of an intoxicated person for his own safety, [4] search for the purpose of recovering stolen property, [5] arrest and search and seizure for the purpose of "keeping the lid on" in a high crime area or of satisfying public outcry for visible enforcement, [6] search for the purpose of removing weapons or contraband such as narcotics from circulation, and [7] search for weapons that might be used against the searching officer.
Oaks, "Studying the Exclusionary Rule in Search and Seizure," 37 U. of Chi. L. Rev. 665, 721-22 (1970). This multiplicity of goals for an arrest or a search and seizure is in sharp contrast to the limited number of reasons for line-ups and confessions, two other types of commonly excluded evidence. The predominant incentive for the latter two is to obtain evidence for use in court. Oaks, supra, at 722. If the evidence is not to be used in court, the possibility of exclusion is a hollow threat.
Even worse than the lack of deterrence, however, is the conduct that the rule does promote among police officers. In a study conducted by Dallin Oaks pursuant to a grant from the National Institute of Law Enforcement and Criminal Justice of the United States Department of Justice, Professor Oaks concluded that "some experienced [police] officers will `twist' the facts in order to prevent suppression of evidence and release of persons whom they know to be guilty." Oaks, "Studying the Exclusionary Rule in Search and Seizure," 37 U. of Chi. L. Rev. 665, 739-40 (1970). Oaks further stated that subsequent to Mapp, "the police were fabricating testimony in order to comply with arrest formalities and circumvent the exclusionary rule." Id. at 708.
A further criticism of the rule is that it fails to "provide effective and meaningful compensation to those citizens, particularly innocent victims of illegal searches and seizures." Wilkey, "The Exclusionary Rule: Why Suppress Valid Evidence?" 62 Judicature 214, 228 (1978). The "compensation" provided for the victims of an illegal arrest or search and seizure is irrational in that "the guilty are overrewarded by a *Page 888 
commutation of all penalties for crimes they did commit and the innocent are never compensated for the injuries they suffered." Wilkey, supra, at 228. The policeman who engages in the unlawful conduct is rarely, if ever, subject to any type of personal sanction. See, Bivens v. Six Unknown Named Agents of theFederal Bureau of Narcotics, 403 U.S. 388, 416, 91 S.Ct 1999,2014, 29 L.Ed.2d 619 (1971) (Burger, C.J., dissenting); Oaks, "Studying the Exclusionary Rule in Search and Seizure," 37 U. of Chi. L. Rev. 665, 724 (1970). The immediate sanction that is triggered by the exclusionary rule is against the prosecutor, whose case against a criminal is either weakened or destroyed. The prosecutor, however, is not an official of the police department. The exclusionary rule is well tailored to deter the prosecutor from illegal conduct. However, he is not the guilty party in an unlawful arrest or search and seizure, and he rarely, if ever, has control over those who are, the police.See 403 U.S. at 416, 91 S.Ct. at 2014, Oaks, supra, at 726.
Furthermore, the exclusionary rule "fails to discriminate between the degrees of culpability of the officer or the degree of harm to the victim of the illegal search and seizure." Wilkey, "The Exclusionary Rule: Why Suppress Valid Evidence?" 62 Judicature 214, 225-26 (1978). Regardless of whether there is a mere technical violation, such as a defective warrant, or a gross violation of the fourth amendment, such as was seen inMapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081
(1961), the penalty is the same; the evidence is excluded. Wilkey, supra, at 226. In contrast, the judicial system customarily applies different standards to crimes that vary as to seriousness, such as in granting bail and in imposing sentence. Id. Additionally, even though "[i]nadvertent errors of judgment that do not work any grave injustice will inevitably occur under the pressure of police work," Bivens v.Six Unknown Named Agents of the Federal Bureau of Narcotics,403 U.S. 388, 418, 91 S.Ct. 1999, 2015, 29 L.Ed.2d 619 (1971) (Burger, C.J., dissenting), these errors are, from a law enforcement standpoint, impossible to correct. Once the unlawful search or arrest is made it is often difficult or impossible to convict the defendant involved, irrespective of his guilt. E. Griswold, Search and Seizure: A Dilemma of theSupreme Court 57 (1975). The courts make decisions as to the legality of arrests and searches and seizures "after full briefs and oral arguments, . . . with full deliberation within the court, and often with numerous and vigorous dissents." E. Griswold, supra, at 52. The same decisions must be made by police officers "usually in a moment or two, with no opportunity for deliberation and in the stress of immediate action." E. Griswold, supra, at 52.
The tenor of the criticism of the exclusionary rule was summed up by Wigmore when he stated that "the two effects of the exclusionary rule are to produce a troublesome grist for the courts and to return rascals to the practice of their nefarious trades." 8 J. Wigmore, Evidence in Trials at CommonLaw (rev. by J. McNaughton) § 2184a at 52 (1961). More important than the outside criticism, however, is the criticism of the exclusionary rule by members of the United States Supreme Court. In the past five years, the members of the Court have, in their opinions, evidenced more and more restraint in the application of the rule.
This "backing off" process began as early as 1954. In that year, the Court decided the case of Walder v. United States,347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). There it held that if a defendant asserts on direct examination that he has never seen or possessed evidence seized unlawfully (there, narcotics), the evidence may be admitted solely for purposes of impeachment. Id. at 64, 74 S.Ct. at 355. The Court stated:
 It is one thing to say that the government cannot make an affirmative use of the evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an *Page 889 
extension of the Weeksdoctrine would be a perversion of the Fourth Amendment.
Id. at 65, 74 S.Ct. at 356.
In Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731,14 L.Ed.2d 601 (1965), the Court ruled that its decision in Mappv. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), was not retroactive. In support of this conclusion, the Court stated that "the fairness of the trial is not under attack,"381 U.S. at 639, 85 S.Ct. at 1743, and that "the ruptured privacy of the victims' homes and effects cannot be restored."381 U.S. at 637, 85 S.Ct. at 1741.
The Court recognized in Terry v. Ohio, 392 U.S. 1,88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that the exclusionary rule is an imperfect tool for controlling police misconduct. There it stated:
 Regardless of how effective the [exclusionary] rule may be where obtaining convictions is an important objective of the police, it is powerless to deter invasions of constitutionally guaranteed rights where the police either have no interest in prosecuting or are willing to forgo successful prosecution in the interest of serving some other goal.
Id. at 14, 88 S.Ct. at 1876. Terry carved out an exception to the warrant requirement in the area of "stop and frisk," lowering the requirement in that situation from probable cause to "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 27, 88 S.Ct. at 1883.
Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030,22 L.Ed.2d 248 (1969), continued the rationale of Terry when it refused to apply retroactively Katz v. United States,389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the case which defined the limits of fourth amendment protection in terms of reasonable expectation of privacy, 389 U.S. at 353,88 S.Ct. at 512. The Court stated that "we simply decline to extend the court-made exclusionary rule to cases in which its deterrent purpose would not be served." 394 U.S. at 254 n. 24,89 S.Ct. at 1036 n. 24.
Chief Justice Burger's vigorous dissent in Bivens v. SixUnknown Named Agents of the Federal Bureau of Narcotics,403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), has previously been noted, but even the majority opinion in that case was not completely favorable to the exclusionary rule. The majority found it necessary to recognize a cause of action for damages by citizens subjected to unlawful searches and seizures against the officials who violated their fourth amendment rights. Id.
at 397, 91 S.Ct. at 2005.
Michigan v. Tucker, 417 U.S. 433, 94 S.Ct. 2357,41 L.Ed.2d 182 (1974), was a case involving violation of fifth amendment rights. It was, however, highly critical of the exclusionary rule. The Court there stated:
 Just as the law does not require that a defendant receive a perfect trial, only a fair one, it cannot realistically require that policemen investigating serious crimes make no errors whatsoever. The pressures of law enforcement and the vagaries of human nature would make such an expectation unrealistic. Before we penalize police error, therefore, we must consider whether the sanction serves a valid and useful purpose.
Id. at 446, 94 S.Ct. at 2364. The Court went on to say that "[w]here the official action was pursued in complete good faith . . . the deterrence rationale loses much of its force." Id. at 447, 94 S.Ct. at 2365.
The Court made an even stronger statement in United States v.Peltier, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). There it stated that "evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." Id. at 542, 95 S.Ct. at 2320. Peltier
declined to apply retroactively the rule of Almeida-Sanchez v.United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596
(1973), which requires a warrant for border searches made elsewhere than at established border crossings. *Page 890 
The Court found in United States v. Ceccolini, 435 U.S. 268,98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), that the taint of an unlawful search and seizure is much easier to attenuate where the evidence discovered was the identity of a live witness who later testified at trial. "The penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve," the Court stated. Id. at 279,98 S.Ct. at 1061. Mr. Justice Rehnquist, writing for the Court, concluded that "the degree of free will exercised by the witness is not irrelevant in determining the extent to which the exclusionary rule will be advanced by its application." Id.
at 276, 98 S.Ct. at 1060.
Even more compelling than the language cited from the foregoing cases, however, are the numerous exceptions to the exclusionary rule the Court has created over the years. Although "a search conducted without a warrant issued upon probable cause is per se unreasonable," Schneckloth v.Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043,36 L.Ed.2d 854 (1973), and "the burden is on those seeking [an] exemption [from the requirement] to show the need for it," Chimel v.California, 395 U.S. 752, 762, 89 S.Ct. 2034, 2039,23 L.Ed.2d 685 (1969), quoting United States v. Jeffers, 342 U.S. 48, 51,72 S.Ct. 93, 95, 96 L.Ed. 59 (1951), the Court has recognized that "[t]here are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with." Johnson v. UnitedStates, 333 U.S. 10, 14-15, 68 S.Ct. 367, 369-70, 92 L.Ed. 436
(1948). These exceptions have multiplied over the years, and have seriously limited the scope of the warrant requirement and, a priori, the exclusionary rule.
The first exception to be recognized by the Supreme Court was the automobile exception. It held in 1925, in the case ofCarroll v. United States, 267 U.S. 132, 45 S.Ct. 280,69 L.Ed. 543 (1925), that a warrant to search an automobile could be dispensed with since "[b]efore a warrant could be secured the automobile would be beyond the reach of the officer." Id. at 146, 45 S.Ct. at 282. The Court went on to say, however, that the officer carrying out the search must possess "a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction." Id. at 149, 45 S.Ct. at 283. In other words, there must be probable cause for the search. This mandate has been required in all cases setting out exceptions to the warrant requirement. The automobile exception was further developed in Chambers v.Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). There the Court again focused on the mobility of the car, and held further that a car could be searched without a warrant even after the suspect-driver of the automobile had been arrested and the car had been driven to the police station. However, the Court limited the exception in the case of stationary cars in Coolidge v. New Hampshire, 403 U.S. 443,91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), stating that "[t]he word `automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." 403 U.S. at 461-62,91 S.Ct. at 2035-36. More recently, the Court has held that police may make a warrantless search of an automobile at the station house for the purpose of making an inventory of its contents.South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092,49 L.Ed.2d 1000 (1976). The justification for this rule is threefold. First, the police have the responsibility of protecting the owner's property while it remains in police custody. Second, the police may conduct an inventory to protect themselves against claims or disputes over lost or stolen property. Third, an inventory will protect police and the public from potential hazards, such as bombs or other explosive devices. 428 U.S. at 369, 96 S.Ct. at 3097. An inventory may be made not only of cars driven by persons who have been arrested, but also of cars abandoned or towed away for parking violations. 428 U.S. at 368, 96 S.Ct. at 3096. *Page 891 
A second exception promulgated by the Court was the "evanescent evidence" exception. This exception applies to evidence that is either of short duration or highly destructible. Schmerber v. California, 384 U.S. 757,86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), dealt with the suppression of a blood-test for the purpose of showing the percentage of alcohol in the defendant's blood. The Court recognized that "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." Id. at 770, 86 S.Ct. at 1835. Because of the short duration of the existence of this type of evidence, and because of the length of time necessary to procure a warrant, the Court held that "the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest." Id. at 771, 86 S.Ct. at 1836. In Cuppv. Murphy, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973), the Court extended this doctrine to searches and seizures of evanescent evidence that were not incident to arrests. There the police took fingernail scrapings from a suspect who was present at the police station but who was not under arrest. The validation of the search was premised on "the existence of probable cause, the very limited intrusion undertaken incident to the station house detention, and the ready destructibility of the evidence." 412 U.S. at 296, 93 S.Ct. at 2004.
The Court set forth the so-called "hot pursuit" exception inWarden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782
(1967). There the Court upheld the search of a residence for "a suspected felon, armed, within the house into which he had run only minutes before the police arrived." Id. at 299,87 S.Ct. at 1646. The scope of the search, the Court held, is "as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape." Id. The Court justified its holding on the ground that "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." Id. at 298-99,87 S.Ct. at 1645-46.
A search warrant is not required when the party in control of the searched premises gives his consent to the search,Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S.Ct. 2041,2045, 36 L.Ed.2d 854 (1973). The consent, however, must be "freely and voluntarily given," and the prosecution has the burden of proving voluntariness, Bumper v. North Carolina,391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968). Consent given after a claim of authority to search by a police officer is not valid, since he has in effect told the occupant of the house that he has no right to resist the search. "Where there is coercion there cannot be consent." 391 U.S. at 550,88 S.Ct. at 1792. However, "knowledge of a right to refuse is not a prerequisite of a voluntary consent." 412 U.S. at 234,93 S.Ct. at 2051. Although consent may not be coerced, either explicitly or implicitly, "[v]oluntariness is a question of fact to be determined from all the circumstances."412 U.S. at 248-49, 93 S.Ct. at 2058-59. While knowledge of the right to refuse consent to a search, or lack thereof, is a factor to be considered in assessing voluntariness, it is not determinative.412 U.S. at 249, 93 S.Ct. at 2059.
The permissible limits of a search incident to arrest were set out by the Court in Chimel v. California, 395 U.S. 752,89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), and Chambers v. Maroney,399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Chimel held that an arresting officer may search "the arrestee's person and the area `within his immediate control.'" 395 U.S. at 763,89 S.Ct. at 2040. The phrase "area within his immediate control" was construed to mean "the area from within which he might gain possession of a weapon or destructible evidence."395 U.S. at 763, 89 S.Ct. at 2040. Chambers, however, limited that search to the time and place of the arrest, since "[o]nce an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." 399 U.S. at 47, 90 S.Ct. at 1979, quoting Preston v.United States, 376 U.S. 364, 367, 84 S.Ct. 881, 883,11 L.Ed.2d 777 (1964). *Page 892 
The "plain view" exception was developed by the Court inCoolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022,29 L.Ed.2d 564 (1971). Basically, the police "may seize evidence in plain view without a warrant." Id. at 465, 91 S.Ct. at 2037. However, for the doctrine to apply, the police must be legitimately on the premises, by way of a warrant or one of the other recognized warrant exceptions, id. at 465,91 S.Ct. at 2037, and the "discovery of evidence in plain view must be inadvertent." Id. at 469, 91 S.Ct. at 2040. "[P]lain view alone
is never enough," id. at 468, 91 S.Ct. at 2039; it must be coupled with a warrant or with one of the other exceptions.
A final way in which the Supreme Court has limited the application of the exclusionary rule is by drawing strict standing requirements for defendants who challenge the admissibility of unlawfully seized evidence. At the time Mappv. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), was decided, standing was governed by the case of Jones v.United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697
(1960). Under Jones, "anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him."362 U.S. at 267, 80 S.Ct. at 734.
The broad standing requirements of Jones, however, were somewhat narrowed in Alderman v. United States, 394 U.S. 165,89 S.Ct. 961, 22 L.Ed.2d 176 (1969). The Court held there that "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." Id. at 171-72,89 S.Ct. at 965-66. The Court recognized the exclusionary rule and reiterated its importance, but stated:
 [W]e are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth.
Id. at 174-75, 89 S.Ct. at 966-68.
United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613,38 L.Ed.2d 561 (1974), followed Alderman very closely, while also discussing the "balancing process" used in determining standing. The Calandra Court described the exclusionary rule as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."Id. at 348, 94 S.Ct. at 620.
The most recent pronouncement by the Supreme Court on the subject of standing to challenge evidence seized in violation of the fourth amendment is found in Rakas v. Illinois,439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). There the Court adopted the "reasonable expectation of privacy" test of Katz v.United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576
(1967), in cases involving standing. The Court attempted to reconcile Jones v. United States, 362 U.S. 257, 80 S.Ct. 725,4 L.Ed.2d 697 (1960), by stating:
 [T]he holding in Jones can best be explained by the fact that Jones had a legitimate expectation of privacy in the premises he was using and therefore could claim the protection of the Fourth Amendment with respect to a governmental invasion of those premises, even though his "interest" in those premises might not have been a recognized property interest at common law.
439 U.S. at 143, 99 S.Ct. at 430. Rakas revealed an underlying dissatisfaction with the exclusionary rule by stating that "[e]ach time the exclusionary rule is applied it exacts a substantial social cost for the vindication of Fourth Amendment rights. Relevant and reliable evidence is kept from the trier of fact and the search for truth at trial is deflected."439 U.S. at 137, 99 S.Ct. at 427. Since the Petitioner failed to show that, as a passenger, he had a legitimate expectation of privacy in the glove compartment of the car in which he was riding, he had no standing to challenge the admission of the evidence. *Page 893 
The requirements surrounding arrest warrants are more lenient than those concerning search warrants. Although the Supreme Court has expressed a preference for arrest warrants, Beck v.Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), the common law rule authorizing felony arrests on probable cause without a warrant remains the law. United States v. Watson,423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). However, police may not make a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. Paytonv. New York, 445 U.S. 573, 100 S.Ct. 1371 (1980). Nevertheless, an unlawful arrest is not a defense to a criminal action.Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541
(1952). The problem in most cases involving an illegal arrest, as is the problem in the present case, is that any search conducted incident to an unlawful arrest is invalidated, thus rendering inadmissible any evidence seized pursuant to the search. The same problems therefore, associated with unlawful searches and seizures are also relevant to arrests made on less than sufficient probable cause. Although a defendant may be guilty, the evidence that proves that fact cannot be used if he was arrested before a police officer's suspicions have hardened into probable cause.
The exclusionary rule is a crude, heavy-handed sanction of doubtful effectiveness. Although there is no doubt that there is a necessity for some sanction, it is now time to explore alternatives to the exclusionary rule. Chief Justice Burger has suggested that "Congress should develop an administrative or quasi-judicial remedy against the government itself to afford compensation and restitution for persons whose Fourth Amendment rights have been violated." Bivens v. Six Unknown Named Agentsof the Federal Bureau of Narcotics, 403 U.S. 388, 422,91 S.Ct. 1999, 2017, 29 L.Ed.2d 619 (1971) (Burger, C.J., dissenting). The exclusionary rule is an impairment to the search for truth; it vastly overreaches its function as a disciplinary measure for police officers. A comparison between our system, with its exclusionary rule, and that of Great Britain, which does not have such a rule, fails to reveal in the British system any of the abuses warned against by proponents of the rule. "Abuse of power by the police is not thought to be a problem in England and Wales. . . . The reputation for excellent police work which the British have established and which others envy seem to the foreign observer to be well justified." E. Friesen I. Scott,English Criminal Justice: An Introduction for American Readers
63-64 (1977). The English procedure consists of rigorous investigation of all complaints against the police, no matter how petty. E. Friesen I. Scott, supra, at 63. Confessions are evaluated merely on the basis of voluntariness; if voluntary they are admitted, otherwise they are excluded. The Royal Commission on Criminal Procedure, Part II of the WrittenEvidence of the Commissioner of Police of the Metropolis 145 (1978) [hereinafter cited as Royal Commission]. The standard of voluntariness is admittedly more stringent than the American standard, as evidenced in the case of R. v. Partridge [1836] 7 C. P. 551, wherein the statement "I should be obliged to you if you would tell us what you know about it; if you will not, of course, we can do nothing," was held to render a confession involuntary. However, evidence discovered as a result of an involuntary confession is admissible, since the involuntariness of a confession only goes to its reliability. Royal Commission,supra, at 148.
To summarize, given the history of the development and application of the exclusionary rule as applied to the states, and its obvious failure to accomplish its stated purpose of deterring unlawful police conduct, we are simply not willing to extend the rule any further than is necessary to comply with decisions of the United States Supreme Court. Therefore, the decision of the Court of Criminal Appeals is reversed, and we remand this case to that court so that the verdict of the trial jury may be reinstated.
REVERSED AND REMANDED. *Page 894 
MADDOX, ALMON, SHORES and BEATTY, JJ., concur.
FAULKNER, JONES, and EMBRY, JJ., would quash the writ and, therefore, dissent.
ADAMS, J. (not sitting).